COATS LOADERS & STACKERS, Inc., whose name has been changed to Coats Company (a co-partnership consisting of G. E. Coats, Wonnie Coats, Bonnie Semprini, and Evelyn Nordstrom), Appellant,

v.

Robert D. HENDERSON and Big Four Industries, Inc., Appellees.

Naomi F. TEEGARDEN, Verne Stephenson and Coats Company (a co-partnership consisting of G. E. Coats, Wonnie Coats, Bonnie Semprini and Evelyn Nordstrom), Appellants,

v.

BIG FOUR INDUSTRIES, Inc., Appellee.

Nos. 12420, 12421.

United States Court of Appeals Sixth Circuit.

May 17, 1956.

Charles F. Meroni, Chicago, Ill., Rudolph L. Lowell, Des Moines, Iowa (George P. Comfort, Des Moines, Iowa, John M. McCaslin, Cincinnati, Ohio, on the brief), for appellants.

Truman A. Herron, J. Warren Kinney, Jr., Cincinnati, Ohio (Edward B. Evans, Cincinnati, Ohio, on the brief), for appellees.

Before MARTIN, MILLER and STEWART, Circuit Judges.

STEWART, Circuit Judge.

These are joint appeals from judgments of the district court in two related patent cases.

The first was an action for a declaratory judgment filed by Coats against Henderson and Henderson's licensee Big Four to establish the right of Coats to make, use, and sell tire dismounting devices which had been alleged to infringe Henderson patent 2,609,039. Henderson and Big Four filed a counterclaim alleging infringement of that patent by Coats. The district court, filing findings of fact and conclusions of law but no opinion, concluded that the Henderson patent was valid and infringed, and accordingly entered judgment for Henderson and Big Four.

The second action was brought against Big Four by Coats and others as the owners of Teegarden patent 2,413,010 for infringement of that patent by Big Four in making, using, and selling the Henderson devices. In that case the district court, also without opinion, concluded that there was no infringement, and accordingly also entered judgment for Big Four.[1]

No separate trial of the second case was had in the district court. After the conclusion of the hearing in the first action the two cases were consolidated, and it was agreed by the parties that the evidence in the first action was to apply with equal force and effect in the second. The appeals were heard together in this court.

The underlying facts can be briefly stated, and the relevant history of the tire changing art briefly told.

For the last twenty years or so the manufacturers of all passenger automobiles and of many trucks have standardized on so-called "drop center" wheel rims. On a drop center rim the circumferential surface (that is, the surface upon which the tire is placed) is terraced progressively downward and inward from each side to a circumferential well at the center. (Thus a cross-section of this surface of the rim looks like a valley with both slopes terraced.) A modifica-

---

1. The full corporate, partnership and individual identities of the parties appear in the caption.

tion of the drop center rim which some manufacturers have used for the last ten years or so is the so-called "safety rim," which is a conventional drop center rim having a peripheral ridge on the rim flange to hold the tire on the rim in the event of a blow-out.

The reinforced edges of the tire which seat on the rim are called the "beads" of the tire. It is impossible to stretch the beads because they are reinforced with steel wire. To remove the tire from the rim it is therefore necessary to "break the bead" on one side by pushing or prying it inwardly toward and finally into the drop center. This permits the bead on the other side to be likewise dislodged from the rim.

Prior to 1947 the means most commonly used by operators of commercial garages and others to remove a tire from a rim were relatively simple hand tools, such as a broad-faced chisel and a sledge hammer. In the hands of an experienced person this method was adequate, but the job was not easy, and there existed a risk of damage to the sidewalls of the tire. Removal of a tire from a safety rim was particularly difficult. There were also in use some mechanical devices and various semi-mechanical hand tools, many of them covered by various patents, but none acquired wide commercial acceptance for any length of time.

On December 10, 1946, Henderson filed an application for a patent on an "Axially Compressing Type Tire Dismounting Apparatus." This application was substantially amended on January 28, 1949, and patent 2,609,039 finally issued to Henderson on September 2, 1952. Commercial embodiments of the structure of the Henderson patent were first introduced on the market in early 1947 by Henderson's licensee, Big Four. These devices met immediate and widespread commercial acceptance.

On the Henderson device, the wheel is centered and locked horizontally on a round table standing a few feet off the floor on a single pedestal. A rotatable bracket is mounted on the pedestal below the surface of the table. To this bracket are attached the "upper bead breaker" and "lower bead breaker." Each bead breaker consists of a curved pry bar hinged to a lever so that when the lever is raised the tips of the pry bars rest against and follow the contour of the rim inwardly from each side towards the drop center. The tire is dislodged from the rim by the action of these bead breakers, applied successively at various points around the circumference of the tire. The lower bead breaker can be operated either independently of or simultaneously with the upper bead breaker, since the latter is positioned manually, while the lower bead breaker is both positioned and operated automatically by raising the lever.

In 1950, while Henderson's application was still pending in the Patent Office, Coats began manufacturing and selling mechanical tire removers similar to those being manufactured by Big Four, and it was manufacturing and selling these devices at the time Henderson's patent issued in 1952. Thereafter Coats manufactured and sold three successive modifications of its device. It was these Coats devices, both the original model and the three successive models, which the district court in the first case found infringed the Henderson patent.

In 1943 Teegarden had applied for a patent on a "Tire Handling Stand," which on December 24, 1946, issued as patent 2,413,010. On the rather complex Teegarden device, the wheel is mounted vertically on a center post and held rigid by rim clamps. An inner bead engaging bar and an outer bead engaging bar are then hydraulically operated so as to push the tire beads inwardly toward the drop center of the rim. The bead engaging bar cannot be rotated around the wheel as in the Henderson device, but, as in Henderson, the two bead engaging elements can be operated either simultaneously or sequentially. Only one structure was ever built under this patent, a machine owned and operated by Mr. Teegarden himself in his commercial garage at Goshen, Indiana. Efforts to com-

mercialize the device were unsuccessful, and its operation was abandoned by Mr. Teegarden during his lifetime.

It is not claimed that the Coats tire removers were manufactured under the Teegarden patent, nor indeed that Coats ever manufactured or sold devices similar to the Teegarden combination. Coats, however, did acquire an exclusive license under the Teegarden patent after the Henderson case had been initiated, and it was this patent which the district court in the second case held was not infringed by Big Four in manufacturing the Henderson tire removers.

At the time of the district court hearing, Big Four and Coats each had an approximately equal share of the United States market in mechanical tire removers. Together they accounted for ninety per cent of all such devices sold. The market has become a substantial one since 1947. The dollar volume of the tire removers sold by Big Four alone had exceeded $7,000,000 at the time of the district court hearing.

As stated, the devices of each of the patents in suit provide means for dislodging both beads of the tire from the rim. At issue here, however, are only those claims of each patent which relate to the operation of the "inner bead breaker" or "lower bead breaker."

While the several questions presented on these appeals are to some extent interrelated, it will promote intelligible discussion to isolate them for consideration.

*The Issues as to the Validity of Henderson Patent 2,609,039.*

The Henderson claims in issue are claims 1, 2, 3, 6 and 7. Claims 2 and 7 are typical and are set out in the margin.[2] The basic inventive concept of the

2. 2. A device for prying loose the bead of a pneumatic tire from a complementary portion of a rim of a wheel on which the tire is mounted, said device comprising, a member providing a guiding edge, means for holding a wheel against axial and lateral displacement in such position that the juncture of the bead of a tire and the rim of said wheel held by said holding means resides adjacent the said guiding edge toward one side thereof, a shoe having a forward prying portion presenting a face inclined inwardly toward the central axis of a wheel held by said holding means, the said shoe being located at the other side of said guiding edge and the said inclined face being engageable therewith, means for biasing said shoe toward said guiding edge, and means for actuating said shoe comprising a lever to which a portion of said shoe remote from the forward prying portion is pivotally connected and means for pivotally mounting the said lever at an axis which is fixed in respect to said guiding edge and which resides generally between the said guiding edge and the axis at which the said shoe is pivotally interconnected with said lever, whereby the actuation of said lever is effective to advance the inclined face of the shoe along the guiding edge for engagement of the forward prying portion with the juncture of the rim of a wheel held by said holding means and the bead of a tire mounted on said rim, the said lever, upon further movement, subsequently advancing the forward portion of said shoe along the cross sectional contour of said rim under the guidance of the rim itself.

7. A device for loosening the bead of a pneumatic tire from complementary portions of the rim of a wheel, which device comprises a centering post, a wheel supporting table on said post, means to center and lock a wheel on said table, means rotatable on said post below said table, a lever pivotally secured to said rotatable means below said table, a curved bead breaking jaw pivotally secured at one of its ends to said lever on that side of the pivotal connection of said lever with said rotatable member which is remote from said table, said curved bead breaking jaw having its concave side facing said central member and having its free end portion engageable with the edge portion of said table when said lever is in its inoperative position, and means urging the free end of said jaw toward said central member, whereby the free end portion of said jaw will automatically engage and move upwardly over the outer periphery of the table and then contact and progressively follow the contour of the inner face of the rim of the wheel for progressively prying and loosening the bead of a tire mounted on said wheel incident to movement of said lever for elevating said jaw.

Henderson claims in issue is, according to the appellees, "to break the bead on any type or size of vehicle tire by inserting a bead breaking shoe into the juncture between the tire and the rim and beneath the tire bead, and then advancing this shoe *under direct guidance of the rim* until the bead itself has been forced completely into the drop center of the rim. A secondary concept is to accomplish this operation by a circumferentially rotatable shoe adapted to be inserted successively at various points around the bead and rim juncture."

Coats argues that the district court was in error in not holding these claims invalid on one or more of the following separate grounds: (a) that they were fully anticipated by the prior art; (b) that they lack invention; (c) that they are indefinite, ambiguous, and functional; and (d) that there was a public use of the device covered by the claims more than a year before the first disclosure thereof to the Patent Office. These contentions will be discussed in the order stated.

Coats bases its claim of anticipation primarily upon three prior patents, in addition to Teegarden: Toles, 2,449,960, Butterfield, 2,534,950, and Heineke, 1,651,389. Of these, Butterfield and Heineke were cited as references by the Patent Office, and Toles and Teegarden were not.

The Heineke patent discloses a device for removing a tire from the clincher type of rim which antedated the drop center rim. Coats does not contend that the bead engaging element disclosed by Heineke in any way anticipated Henderson. The relevance of the Heineke disclosure is limited to the rotatable bracket of the Heineke device, which, it is asserted, when combined with the bead breaking mechanism disclosed by Toles, Butterfield, and particularly by Teegarden, constitutes a complete anticipation of Henderson.

We think it clear that the bead breakers disclosed by Toles and Butterfield fall short of constituting an anticipation of Henderson. The Toles device operates in an entirely different manner from that of Henderson. In Toles the bead engaging element is referred to as an "elongated spoon" extending from a dog. While it is stated in the specification that "the link arrangement of the tire tool will push the spoon point under the rim between the tire and the rim till it touches the base of the rim and the handle contacts the pin," the specification makes clear that the spoon point, instead of being guided by the contour of the rim, is maintained "in the proper position with respect to the tire and rim" by means of a pin and roller combination.

The Butterfield device also operates upon a principle quite different from that of Henderson. In Butterfield the bead breaking operation is accomplished by two thrust pieces connected to oppositely disposed pusher links and rocker arms. Though the Butterfield specification states that these thrust pieces converge to "blade-like edges which are adapted to penetrate the joint between tire bead and rim flange," it is apparent that the thrust pieces do not track on nor are they guided by the contour of the rim surface in pushing the tire beads inwardly towards the drop center.

Nowhere in either Toles or Butterfield is there disclosed a device remotely resembling the rim guided bead breaker of Henderson. Consequently, even if it were mechanically possible to combine the bead engaging elements of the Toles or Butterfield devices with the rotating bracket of Heineke, the Henderson bead breaker would be no further disclosed.

It is upon the Teegarden patent, however, both alone and collectively with Heineke, that Coats most emphatically bases its claims of anticipation.

That the Teegarden patent was essentially a paper patent, meeting with no commercial success and having no actual influence upon the practical manufacture of tire dismounting apparatus is of course irrelevant to the question of whether its disclosures constituted an anticipation. The "paper" status of the

Teegarden patent would have bearing only in the determination of that patent's validity or scope. Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir., 1945, 147 F.2d 345, 350; E. J. Books Co. v. Klein, 3 Cir., 1940, 114 F.2d 955, 957; In re Coey, 1951, 190 F.2d 347, 351, 38 C.C.P.A., Patents, 1200. We find no indication in the record, however, that the district court failed to recognize this fundamental distinction, as Coats so strenuously argues.

The issue as to the teachings and disclosures of the Teegarden patent has been considerably beclouded by a controversy between the parties as to the actual mode of operation of the Teegarden structure. As stated, only one tire remover was ever constructed under the Teegarden patent. This device was introduced in evidence in the trial court by Coats. Counsel for Henderson and Big Four contend that it had been altered in an effort to meet the needs of this litigation, and that it represented a substantial departure from the disclosures of the patent. Another structure was introduced in evidence by Henderson and Big Four which their expert witnesses testified was a true and exact representation of the Teegarden patent in so far as the elements in issue were concerned. Counsel for Coats, in turn, attacked this model as a self-serving misrepresentation of the patented combination.

This factual controversy revolves primarily around the question of whether Teegarden's inner bead engaging element, called a "bead engaging bar" by Teegarden, passes over the upper rim clamp or is positioned adjacent to that clamp. Henderson and Big Four contend that the bar passes over the clamp, which they say would make it physically impossible for the bar to be guided by the contour of the rim. Coats insists that the bead engaging bar in Teegarden is adjacent to the rim clamp, and the original Teegarden device which they introduced in evidence was so arranged at the time of the hearing.

The drawings, specification, and claims of Teegarden contain inherent inconsist-

encies with respect to this factual question. For example claim 6 describes the bead engaging element as "adjacent said fixed rim clamping element;" Figure 1 of the drawings appears to represent the bead engaging bar as adjacent to the rim clamp, while Figure 4 clearly represents the bead engaging bar as passing over the rim clamp. Yet it was testified that all the drawings were made directly from the sole original Teegarden model, and there is no indication in the specification or claims of any intention to claim any modification of this original embodiment of the patent.

Another factual issue as to the mode of operation of the Teegarden device relates to the action of the upper rim clamp. Relying on certain language in claims 7 and 9 of the patent, and upon a demonstration of the models introduced in evidence, counsel for Henderson and Big Four vigorously assert that this rim clamp actually performs the "primary" bead breaking operation, and that the inner bead engaging bar thereafter merely performs the secondary function of pushing the tire casing into the drop center. This contention is as vigorously denied by counsel for Coats.

The district court made no findings upon either of these factual issues. In our opinion, however, their resolution is not necessary to a determination of the question of anticipation of the Henderson patent by the disclosures of Teegarden. Even assuming that the inner bead engaging bar of Teegarden is positioned adjacent to the upper rim clamp, and that no bead breaking function is performed by that rim clamp, we think it is clear that the bead breaking operation disclosed by Teegarden is different in kind from Henderson's concept. Teegarden unambiguously discloses that while his inner bead breaking bar "follows" generally the contour of the rim inwardly toward the drop center in the sense that it parallels that contour, it does not "follow" the rim in the sense of being guided by it. Teegarden's bar rests upon a stop, the function of which, as expressly described in the specifica-

tion, is to prevent "following the drop center, and thus I avoid pinching the tube." Moreover, the path of travel of the bead breaking bar disclosed in Teegarden's drawings and expressly referred to in the specification parallels the rim but does not follow the rim in the sense of tracking upon it. The direction of the path is determined by the stop and the actuating lever, rather than by the contour of the rim.

It apparently would be mechanically impossible to combine the device disclosed by Teegarden with Heineke's rotating bracket, just as it would be impossible to combine Heineke's device with that of either Butterfield or Toles. In any event, we think it is clear for the reasons expressed that Henderson's patent was not anticipated by Teegarden, in combination with Heineke or otherwise.[3]

Moreover the district court was not in error in finding that invention resided in the Henderson patent. Henderson perceived the vital forward step unrecognized by his predecessors in the art. The inherent advantages in continuous application of the point of the bead breaking shoe at the juncture of the bead and the rim, across the face of the rim into the drop center, simple enough in retrospect, were neither obvious to nor perceived by those having ordinary skill in the art. Among those advantages are the comparative ease of removing a tire when the continuous point of attack is at the juncture of the bead and the rim, the automatic adaptation of the device to any size or shape rim, and the impossibility of damaging the side wall of the tire itself.

Henderson's patent was obtained in what was unquestionably a crowded art. Many earlier efforts to create a fully mechanical tire remover had failed to gain acceptance despite an urgent demand for such a device. The acceptance by the market of Henderson's device was immediate, dramatic, and enduring. Commercial success and the filling of a long-felt want are not in themselves criteria of invention. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973; O'Leary v. Liggett Drug Co., 6 Cir., 1945, 150 F.2d 656, 666. They are relevant considerations, however, when the question as to whether invention resides is thought to be a close one, and particularly so where the acceptance of the new device is as immediate and dramatic as it was here. Goodwin v. Borg-Warner Corp., 6 Cir., 1946, 157 F. 2d 267, 273.

Others far more experienced than the writer of this opinion have reached the conclusion that the quality of invention is an abstraction impossible to define. See Trabon Engineering Corp. v. Dirkes, 6 Cir., 1943, 136 F.2d 24, 27. Suffice it to say that the Henderson claims in issue, involving as they do a mechanical principle of theretofore unappreciated and unrecognized application to the art, amounted to considerably more than a mere felicitous selection of known elements contributing in combination an obvious result. Cf. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Cold Metal Products Co. v. Newport Steel Corporation, 6 Cir., 1955, 226 F.2d 19.

The contention that the Henderson claims in suit are invalid by reason of being ambiguous and functional is without merit. Under the statute in effect when Henderson's application was filed, he was required to disclose his invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains or with which it is most nearly connected to make, construct, compound and use the same; * * * and he shall particularly point out and distinctly claim the

---

**3.** The fundamental difference between Teegarden's and Henderson's bead breakers was accurately if informally described by the district judge in commenting upon the Teegarden model in colloquy: "It appears there that it's pushing the bead away by force rather than getting under it."

part, improvement, or combination which he claims as his invention or discovery." 35 U.S.C. § 33 (1946 Ed.).[4] See General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232. The claims in issue clearly and intelligibly set out the elements of the claimed patentable combination and therefore meet the statutory requirement of particularity and distinctness.

A more formidable attack upon the validity of the Henderson patent is grounded upon Coats' contention that there was a public use of the device covered by the claims in issue more than a year before the first disclosure thereof to the Patent Office. At the time of Henderson's application the law provided that "Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, * * * *not in public use or on sale in this country for more than one year prior to his application* * * * may* * * obtain a. patent therefor." 35 U.S.C. § 31 (1946 Ed.); cf. 35 U.S.C.A. § 102(b).

Henderson's original application was filed December 10, 1946. Early in 1947 Big Four began to sell commercial embodiments of the Henderson device. Considerably more than one year later, on January 28, 1949, Henderson filed an amendment to his application, and the patent finally issued on September 2, 1952. The theory of the argument made by Coats is that Henderson's 1949 amendment represented a complete departure from his original disclosure, and that not until the date of that amendment did Henderson disclose the invention of the claims in suit. If this factual theory is correct, the argument is clearly sound under the doctrine of Muncie Gear Works v. Outboard Marine & Manufacturing Co., 1942, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171.

In that case the claims in suit related to a combination to reduce cavitation in outboard motors, consisting of an anti-cavitation plate, which alone was an old element, in conjunction with a streamlined housing for the engine and propeller shafts. The original patent application "* * * in no way suggested the combination now asserted as his invention. * * * No cross section of this housing was drawn or indicated, and for all that appears from the drawing it might have been circular, triangular or rectangular. * * * The specifications and drawings both indicated an anti-cavitation plate * *, but it was in no way asserted that the cavitation plate was new, or that it was being employed in any novel cooperative relation to the other elements." 315 U. S. at page 761, 62 S.Ct. at page 866.

In amendments filed two and a half years after his original application the inventor "for the first time made claims relating to the exterior surface of the housing." 315 U.S. at page 762, 62 S.Ct. at page 867. There had been a public use and sale of devices embodying the asserted invention more than two years before it was first presented to the Patent Office in the amendments. The Court held the claims in suit invalid, stating "Section 4886 of the Revised Statutes would in terms provide for their invalidity had they been offered by application rather than by amendment; and whatever may be the efficacy of an amendment as a substitute for an application, it surely can effect no more than the application itself." 315 U.S. at page 768, 62 S.Ct. at page 869.

The Supreme Court's decision in the Muncie Gear case established no new principle, but it is the most recent and a particularly lucid exposition of the settled rule that an application for a patent cannot be broadened by amendment to embrace an invention not disclosed in the application as filed, when adverse rights of the public have intervened. Railway Co. v. Sayles, 1879, 97

4. Compare 35 U.S.C.A. § 112.

U.S. 554, 563, 24 L.Ed. 1053; Schriber-Schroth Co. v. Cleveland Trust Co., 1938, 305 U.S. 47, 57, 59 S.Ct. 8, 83 L.Ed. 34. See Jacquard Knitting Mach. Co. v. Ordnance Gauge Co., D.C.E.D.Pa.1951, 95 F.Supp. 902, 906, affirmed 3 Cir., 1954, 213 F.2d 503; R. U. V. Engineering Corp. v. Borden Co., 2 Cir., 1948, 170 F.2d 688, 689; Engineering Development Laboratories v. Radio Corporation of America, 2 Cir., 1946, 153 F.2d 523, 526.

Major portions of the parties' briefs are devoted to discussing the application of the Muncie Gear doctrine to the case at bar, and the issue was the subject of an extended separate hearing in the district court. The ultimate question is: was the invention which is now claimed disclosed in the original application, or was it not disclosed until the amendment filed in 1949?

The district court made an unambiguous finding upon this issue: "The original application for Henderson Patent No. 2,609,039 contains in its drawings, specifications, and claims a full and complete disclosure of Claims 1, 2, 3, 6 and 7 of said patent as issued. Changes in said application, by amendment, during the course of prosecution thereof did not constitute new matter but were merely explanatory of the original disclosure of the application." Despite the ingenious efforts of counsel for Coats to bring the facts of the present case within the reach of the Muncie Gear doctrine, a careful review of the original application, the amendments and the claims as finally allowed convinces us that this dispositive finding of the district court was correct.

■ The parties sharply differ upon the issue of whether the disclosure of the drawings alone is sufficient where validity is challenged on the ground of prior public use. It is settled that drawings are not enough to meet the statutory requirements for a valid application, when standing alone without clear and adequate description. See 35 U.S.C. §

33 (1946 Ed.), quoted above, Permutit Co. v. Graver Corp., 1931, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163. "Where, however, validity is challenged on the ground that a patent is anticipated by prior patents or prior public uses, it would appear that courts have accepted a different standard of disclosure based upon [Webster] Loom Co. v. Higgins, 105 U.S. 580, 594, 26 L.Ed. 1177, which held that an invention relating to machinery may be exhibited in a drawing or in a model so as to lay the foundation for a claim to priority * * *." Hazeltine Research Inc., v. General Motors Corp., 6 Cir., 1948, 170 F.2d 6, 9. But see Ful-Vue Sales Co. v. American Optical Co., D.C. S.D.N.Y.1953, 112 F.Supp. 35. It is worth noting that Justice Jackson's opinion in the Muncie Gear case emphasized that not only the original specification and claims, but also the drawings there completely failed to indicate the streamlined character of the propeller shaft housing, possibly implying that a disclosure in the drawings would have been sufficient.

It is not necessary to decide in this case, however, whether a disclosure by the drawings alone would have been sufficient to forestall application of the Muncie Gear doctrine, because disclosure was not confined to the drawings, but can be found alike in the specification and claims of the original application, when read in conjunction with the drawings. For example, the original specification stated: "It will be noted that the tips of the shoes will follow the conture [sic] of the rim as shown in Fig. 2." Claim 17 of the original application stated: "and said shoes (53 and 54) arranged to follow the conture [sic] of said wheel. * * *" While this language is to say the least succinct, when read in the light of the very clear and full disclosures of the original drawings, we agree with the district court that the application as a whole made a complete disclosure of the claims in suit.[5] Moreover, there is no

---

5. By contrast, although the identical word "follow" is found in the specification and claim 5 of the Teegarden patent, the Tee-

garden drawings reveal a different meaning of that word, as discussed above.

merit whatever in Coats' contention that the drawings themselves made an inadequate disclosure in failing to illustrate an "intermediate position" in the tire removing operation. Indeed, Coats' own witness, Stephenson, conceded in an affidavit that the drawings disclosed the invention of the claims.

■ What occurred during the prosecution of the Henderson application was what often occurs in the course of extensive prosecution in the Patent Office: the claims of the application were substantially amended in order to clearly delineate the invention in relation to the prior art. The claims to the sub-combination finally allowed were so different from the combination originally advanced that the specification was amended to provide a more direct correspondence between the disclosure and the claims. We do not understand that the Muncie Gear decision defeats the validity of claims finally issuing after such a Patent Office history, despite an intervening public use, so long as there was in the original application a full disclosure of the invention finally claimed, as we have found that there was here.

*The Issue of Infringement by Coats of Henderson Patent No. 2,609,039.*

Coats argues that the devices it manufactures do not infringe the Henderson patent for two separate reasons: (a) in the Coats inner bead breaker the shoe has an angular rather than a "curved" jaw as is specified in claims 6 and 7 of the Henderson patent, (b) in the most recent accused model of the Coats tire remover a mechanism is provided to keep the bead breaking jaw from contacting the table edge prior to contacting the rim of the wheel.

At best these contentions would offer but partial defenses to the charge of infringement. As to the first contention, while Claims 6 and 7 of Henderson do specify a "curved bead breaking jaw," the other claims in suit do not use the word "curved." Claim 2, for example, describes the shoe as being "a forward prying portion presenting a face inclined

inwardly toward the central axis of the wheel." That is a precise description of the Coats shoe. During the prosecution of his patent application, Henderson made clear that he was not using the word "curved" in its technical geometric sense. He stated, in support of those claims in which the word "curved" was not used: "In these claims the jaw is not specifically recited as being curved but is rather defined as having a face inclined inwardly toward the center axis of the wheel to avoid the unnecessary implication that jaw 'curvature,' in a geometric sense, is critical. The jaw may be bent or angulated and need not be in the shape of an actual curve generated from a center point." As to the second ground of non-infringement, since the mechanism to prevent the bead breaker from tracking on the edge of the table before contacting the rim is incorporated in only one of the four basic Coats models found by the district court to infringe, it would obviously offer no protection to the other three Coats models accused.

■ We think it is clear, however, that neither of the two grounds relied upon serve even as a partial avoidance of the charge of infringement. A careful review of the expert testimony in the light of our independent examination of the exhibits in evidence convinces us that, despite their minor literal departures from the apparent limitations of the Henderson claims, the Coats devices contain the same structural elements as Henderson's, operating in the same manner and performing the same function. The departures here relied upon are in our opinion almost classic examples of specious, rather than substantial, modifications of the patented device. Great Lakes Equipment Co. v. Fluid Systems, Inc., 6 Cir., 1954, 217 F.2d 613, 616; United States Rubber Co. v. General Tire & Rubber Co., 6 Cir., 1942, 128 F.2d 104, 108; Murray v. Detroit Wire Spring Co., 6 Cir., 1913, 206 F. 465, 468; Hartford-Empire Co. v. Swindell Bros., Inc., 4 Cir., 1938, 96 F.2d 227, 231; E. H. Bardes Range & Foundry Co. v. American

Engineering Co., 6 Cir., 1940, 109 F.2d 696, 698. The district court was not in error in finding that the four accused Coats models all infringed the claims in suit.[6]

*The Issue of Infringement by Big Four of Teegarden Patent No. 2,413,010.*

No issue was made in the district court as to the validity of Teegarden patent 2,413,010. The only question for decision in the second lawsuit was whether or not the structures manufactured and sold by Big Four under its license from Henderson constituted an infringement of Teegarden.[7] The court found as a fact that there was no infringement and dismissed the complaint.

The court was not in error in concluding that the appellants had failed to sustain their burden of proving infringement. Both parties concede that the structures manufactured and sold by Big Four substantially embody the structure of Henderson patent 2,609,039, under which Big Four was licensed, and that the combination disclosed by Henderson may therefore be taken as representative of the Big Four tire dismounting machines. It is undoubtedly true that some of the elements of the structures manufactured by Big Four under the Henderson patent appear to correspond to those described by Teegarden claim 5, broadly and superficially construed. When claim 5 is read in the light of the Teegarden specification, however, it is plain that the invention claimed by Teegarden is quite different in concept and organization from that of the Big Four structures.

█ Most of what has already been said in this opinion in describing the Teegarden and Henderson devices and in discussing the question of whether Henderson's invention was anticipated by Teegarden is equally relevant to the present question of whether the structures actually made and sold under the Henderson patent constitute an infringement of Teegarden. It would needlessly enlarge an already lengthy opinion to repeat the discussion here. Suffice it to emphasize again that claim 5 of Teegarden, when read in the light of the specification, does not describe a structure in which the bead engaging element actually tracks on the rim of the tire, which is the essential element of the structure manufactured by Big Four.

*The Remaining Issues.*

Coats makes three additional contentions on this appeal: (1) that Henderson and Big Four were guilty of unfair competition in certain written and alleged oral statements, (2) that a letter sent by the president of Big Four to Coats' customers after the district court's judgment in favor of Henderson and Big Four so misrepresented the scope of the decree as to justify setting it aside, (3) that a provision in the license agreement between Henderson and Big Four is in illegal restraint of trade so as to preclude the enforcement of the Henderson patent by them. These argu-

6. During the oral argument of these appeals reference was made to a newer Coats model, the so-called "pusher type." Whether that model is an infringement of the Henderson patent was not before the district court and is not before us.

7. Only claim 5 of the Teegarden patent was in issue.

5. In a tire handling stand, a rigid support, rim clamping elements for engaging the rim of a wheel and thereby rigidly supporting the wheel and a tire thereon for removal of the tire from the wheel with the rim and the wheel at one side of the support, a bead engaging element for loosening the bead of the tire from the rim, said bead engaging element being mounted for positive rotational and free translatory movement, a lever to effect such movement, said lever being pivoted to said support adjacent the periphery of the rim and extending away from its axis, said bead engaging element being pivoted to the outer end of said lever and sloping inwardly toward the periphery of the rim to effect a close following of the bead engaging end thereof along the walls of the channel of the rim across its periphery as the bead of the tire casing is pushed from the rim.

ments find slender factual support. That they have been injected at all is a reflection rather of the ingenuity and aggressiveness of able counsel.

Whether Henderson and the agent of Big Four ever made the oral statements attributed to them was a disputed issue of fact in the district court. While the court made no explicit finding upon this subsidiary factual question, it did find that "The defendants have not been guilty of unfair competition in notifications to plaintiffs' exclusive agent and to plaintiffs' customers and prospective customers. Any such notifications given by defendants were proper under the premises and given in good faith." In our opinion this finding was correct. Even assuming that the alleged oral statements were in fact made, they amounted to little more than notification by Henderson and Big Four that Coats was infringing the Henderson patent, and that they intended to take appropriate steps to stop the infringement. Their good faith is evidenced by the fact that they did take such steps within a month after the patent issued. The letter which Henderson wrote to nine major customers of Coats is equally innocuous.[8] Henderson's good faith in writing it is likewise evidenced by the prompt action taken to establish his rights by legal proceedings. "Notices to the competitor that he is infringing, and perhaps to the manufacturer for the competitor, and to a limited number of his chief customers, are the normal procedure and not to be condemned, when characterized by good faith." Oil Conservation Engineering Co. v. Brooks Engineering Co., 6 Cir., 1931, 52 F.2d 783, 785.

As to the letter which Henderson sent to members of the trade after entry of the district court's judgment, it is true as appellants assert that "federal courts have said at times that the successful plaintiff in a patent suit might so misuse his decree that they would vacate it," and that at least one federal court has actually done so. See dissenting opinion in Art Metal Works, Inc., v. Abraham & Straus, Inc., 2 Cir., 1934, 70 F.2d 641, at page 645, adopted as opinion of the court in 1939, 107 F.2d 944; H. W. Peters Co., Inc., v. MacDonald, D.C. D.Conn.1934, 5 F.Supp. 692. The difficulty here is that the letter which Henderson sent was a far cry from the kind of wrongdoing necessary to invoke the doctrine upon which Coats relies. As the district court correctly pointed out when the matter was presented to it, two paragraphs of the letter could well have been left out, but there is no evidence of a deliberate scheme of misrepresentation, that the recipients of the letter were actually misled, or that Coats was damaged by it.

The provision in the license agreement which Coats says violates the anti-trust laws is as follows: "Licensee agrees that it will not sell to any distributor or dealer in which it or any of its stockholders or officers have any financial interest, directly or indirectly, unless otherwise mutually agreed upon." Since the license agreement provided that the royalties payable to Henderson were to be based upon Big Four's net invoices, the obvious purpose of this provision was to obviate the possibility that Big Four would sell licensed tire removers at a reduced price to an alter ego and thus reduce the amount of royalties payable to Henderson. Counsel for Coats concede that they "have found no case directly in point holding that a restrictive covenant of the character of Article 5 herein complained of is a violation of the anti-

8. "Gentlemen: Enclosed find two copies of Bead Breaker Patents issued to me on September 2, 1952, namely # 2,609,038 and # 2,609,039. I wish to call your attention particularly to Patent # 2,-609,039 regarding the bead breaker construction and claims which is being in-fringed by Coats 'Iron Tireman.' Coats, Loaders & Stackers Co., manufacturers of 'Iron Tireman' and Jack P. Hennessy Sales Co. have been put on notice that their tire changer is an infringement of the Henderson Patent # 2,609,-039. Your very truly, R. D. Henderson."

trust laws." The reason for that, we think, is that such a covenant is an entirely reasonable one, with no discernible adverse effect upon the public interest. "Unquestionably, the owner of a patent may grant licenses to manufacture, use, or sell upon conditions not inconsistent with the scope of the monopoly." General Talking Pictures Corp. v. Western Electric Co., 1938, 304 U.S. 175, 181, 58 S.Ct. 849, 852, 82 L.Ed. 1273.

For the reasons stated, the judgments of the district court are in all respects affirmed.