**REHRIG CONTROLS CO., Plaintiff,**

**v.**

**MAXITROL COMPANY, Defendant.**

**Civ. A. No. 23586.**

United States District Court
E. D. Michigan, S. D.

Feb. 7, 1966.

4.  Docket No. MC–117823, SUB 14 TA, Ralph F. Dunkley, doing business as Dunkley Distributing Company, Salt Lake City, Utah.

Barnes, Kisselle, Raisch & Choate, Arthur Raisch, Alfonse J. D'Amico, Detroit, Mich., Harris, Kiech, Russell & Kern, Walton Eugene Tinsley, Los Angeles, Cal., for plaintiff.

John A. Blair, John V. Sobesky, Harness, Dickey & Pierce, Detroit, Mich., for defendant.

MACHROWICZ, District Judge.

This is an action for a declaratory judgment of noninfringement and invalidity of United States Patent No. 2,668,396 owned by defendant. Defendant filed a counter-claim asking the Court to find that its patent is valid and infringed by plaintiff.

A trial was had on issues of validity and infringement at which testimony was offered and numerous exhibits were submitted in evidence by both sides. After a transcript of the trial proceedings was available briefs were submitted and oral argument heard. On basis thereof this Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Both parties to this action manufacture and sell automatic gas pressure regulating valves used for household gas furnaces, gas boilers or gas water heaters, known in the industry as main burner load type domestic appliances.

2. Defendant is owner of the patent in suit, covering a "gas regulator", issued to F. Kern, Jr. on February 2, 1954 on application Serial No. 50,414 filed on September 21, 1948. It manufactures and sells gas regulators of the type disclosed in the patent.

3. The regulator sold by plaintiff was designed by Harold A. McIntosh. United States Patent No. 3,120,256 was issued to McIntosh on this device during the pendency of this suit, on February 11, 1964, on an application filed December 5, 1960.

4. An automatic gas pressure regulating valve is used to maintain a constant or uniform delivered gas pressure to the gas burner regardless of pressure variations that appear in the gas supply line, that is, to maintain a gas pressure at the burner substantially constant while the line pressure at the inlet to the valve varies.

5. A regulating valve has a body provided with a gas passageway connecting an inlet port to an outlet port. The inlet port is intended for connection to the gas supply and the outlet port for connection directly or indirectly to one or more burners. The flow of gas through the passageway is controlled by movement of a valve toward and away from its seat. When the valve member engages its seat, flow through the passageway is blocked (except for possibly unavoidable or negligible leakage). Under normal operating conditions, the valve member is spaced from its seat. It controls the outlet pressure under changing conditions of inlet pressure and flow by moving toward and away from its seat and thereby adjusting the pressure drop through the valve. The outlet pressure is always lower than the inlet pressure but the difference (i. e., pressure drop) is least for any given rate of flow when the valve is wide open (DX–36, Admissions 4, 5).

6. In gas regulators of the type sold by both plaintiff and defendant, the valve member is connected to a diaphragm which is subject to the gas pressure at the outlet (the burner side) acting in a direction to tend to close the valve. A spring acts on the valve member in a direction to tend to open the valve. The equilibrium position of the valve member at any given time is that position at which all forces tending to open the valve equal all forces tending to close the valve. Any change in inlet pressure or rate of flow will cause a change in at least certain of these forces thus tending to move

the valve member to a new position in which the forces are again equalized. (DX–36, Admissions 4, 5).

7. Very low gas pressures are supplied to the appliances for which the automatic gas pressure regulating valves are used. The valve of a gas regulator must float freely and respond to very small changes in pressure on the diaphragm (R. 134, 271). Both the pressure and the valve movements involved are very small (R. 271, 280, 471). The gas regulators of both parties have a valve so mounted and guided that it is capable of moving in response to a very slight change in outlet pressure.

8. When functioning as a gas regulator to maintain a constant outlet pressure, the valve is normally close to its seat (R. 264, 391, 432). Gas regulators sold by the parties seldom if ever operate near the wide-open position of the valve (R. 267–8, 423). They are not intended to be used as shut-off valves.

9. Prior to the grant of the Kern patent in 1954 General Controls Company began making a gas regulator similar to the regulator sold by defendant. After issuance of the Kern patent defendant filed a suit against General Controls Company for infringement of its patent. The controversy resulted in a settlement before trial which included a license agreement under which General Controls, as licensee, pays royalties to defendant on the regulators it manufactures and sells.

10. The accused regulating valve of plaintiff was designed by McIntosh while he was employed by Cam-Stat Incorporated. During the period 1952–7 and prior to his employment with Cam-Stat, McIntosh was employed as an engineer by General Controls Co., defendant's licensee under the Kern patent. He disclaims having gained any knowledge of the Kern device and patent, in connection with projects on which he was working for General Controls while he was employed by them. In 1957 he left General Controls Company and went to work at Cam-Stat Incorporated as assistant chief engineer for the purpose of developing products for gas controls. In 1959 Cam-Stat took steps to place on the market the gas regulator he designed. It made and produced tooling, and sent sample gas regulators to the trade. (DX–59, Admission 30).

11. Defendant, by letters, called attention of Cam-Stat to the Kern Patent in 1959 and 1960. Cam-Stat decided not to engage in the sale of these regulators and late in 1960 sold the program, including tooling, design, inventory and patent rights to Rehrig Pacific Company, plaintiff's predecessor. (R. 116, DX–59, Admission 37).

12. McIntosh knew the regulator program of Cam-Stat would be sold and approached Houston Rehrig with reference to purchase thereof. Houston Rehrig was president of Rehrig Pacific Company and, later, was also president of its successor, plaintiff herein. He directed the affairs of both companies. Rehrig Pacific, which had not theretofore engaged in manufacture and sale of regulators, began manufacturing and selling the present regulators of plaintiff in 1961. On May 4, 1961, defendant charged Rehrig Pacific with infringement and on January 10, 1963 it charged Bryant Manufacturing Co., a customer of plaintiff, with infringement. After notice of the infringement the present plaintiff was incorporated and the gas regulator program and McIntosh transferred to it. To satisfy a request of Bryant Manufacturing Co., for an indemnity against infringement liability, upon defendant's charge of infringement in 1961, Rehrig personally guaranteed any indemnity of plaintiff to Bryant Manufacturing Company in this respect.

13. While Kern was developing his invention, and up to the time the application was filed, all commercial gas regulators were of the poppet design (R. 213, 246) and such design is still used in all commercial gas regulators except those made by the parties to this suit and defendant's licensee, General Controls Company. Poppet regulators therefore furnish the practical commercial standard of

comparison for the gas regulators of the parties.

14. In the poppet type regulator the gas follows a Z-shaped path through the regulator and flow across the valve element is such that there is inlet pressure acting on the bottom of the valve, tending to close it; this is opposed by the lesser outlet pressure acting on the top of the valve, tending to open it. The net effect of these two pressures acting in opposite directions is a continuous upward force, proportional to the inlet pressure, tending to close the valve and thereby reduce the outlet pressure when the inlet pressure increases. Since the purpose of a gas regulator is to maintain a constant outlet pressure, this characteristic of a poppet type regulator is adverse to and inconsistent with the very purpose of the regulator. Because the upward force of inlet pressure on the valve of a poppet regulator is not balanced by a substantially equal downward gas pressure force on the valve, the valve is "unbalanced" or "not balanced". This "unbalance gives a poppet regulator poor regulating characteristics. This fact was known for many years and various expedients have been proposed to overcome it. (R. 294–8, 311, 456–8, DX–43).

15. One way of counteracting the effect of unbalanced forces on the valve of a poppet regulator is to enlarge the diaphragm, that is, use a higher ratio of diaphragm size to port size (R. 298, 456). Since the diaphragm size is the controlling element in the overall size of a regulator, enlargement of the size of the diaphragm increases the size of the entire regulator. (R. 210, 293–4, 438, 458).

16. Other expedients for correcting the lack of balance are (1) the double poppet valve (PX–41) and (2) the poppet with an additional balancing diaphragm (PX–42). In such structures substantially equal inlet pressure forces act in opposite directions on the valve. The first is not used in competition with regulators sold by the parties to this suit and the second is used only to a limited extent (R. 303–14, 440–442), due to the increased cost of manufacture as compared to cost of a poppet-type or a type of regulator sold by the parties.

17. In 1946 Kern started work on developing a new and better type of regulator. In early 1947 he requested Wayne University Research Institute to design a better gas regulator for him but did not disclose results of his own work as he wanted a fresh approach. He furnished to the Institute a poppet regulator he was then making. Reports on the research made by the Institute (DX–30 and PX–55) included a historical development and present state of the art of gas regulators in general; suggested new designs which did not offer a practical replacement for the poppet regulator and none was like the Kern patent; a recommendation to enlarge the size of the diaphragm; and an expressed opinion that Kern's poppet regulator was just about as simplified as one could hope to get it.

18. Kern's efforts culminated in development, late in 1948, of the regulator shown in the patent in suit.

19. It is reasonable to infer from the results of the work at Wayne University Research Institute that it was not obvious to those who worked on the project at the Institute how to arrive at a practical commercial solution for avoiding the defects of the then universally used poppet regulator.

20. Kern's patent in suit solves the problem presented by the poppet regulator. The essence of the Kern regulator resides in the provision of a body having a straight-through gas passage in which there is a substantially conical valve and seat arranged so that the valve moves, under the influence of a diaphragm responsive to outlet pressure, along the axis of the cone and the cone axis is substantially perpendicular to the axis of the passage. As a supplemental feature, the regulator also includes a means to guide the valve for movement along its axis in the form of a rib that engages a bottom edge of the valve on the outlet side of the gas passage.

21. The Kern regulator has a valve which is itself balanced by a combination of inlet and outlet pressure, both acting on parts of the top of the valve in a direction to open the valve and an intermediate pressure acting on the bottom of the valve in the opposite direction. The arrangement is such that if the valve is well guided for movement along the axis of the valve the pressure acting on the bottom of the valve will be half-way between inlet and outlet pressure acting on the top, and the valve will be substantially perfectly balanced. This eliminates unbalanced forces due to inlet pressure that would otherwise interfere with the action of the spring balanced diaphragm in controlling the position of the valve and makes excellent regulation possible with a small size regulator (R. 293–4, 356–6, 441, 488–9).

22. In addition to allowing use of a much smaller diaphragm than poppet regulators to obtain a comparable quality of regulation, the patented regulator has a substantially higher pressure drop capacity or wide open capacity than a poppet regulator of the same size because its straight-through gas passage furnishes less resistance to gas flow than the Z-shaped passage of a poppet regulator (R. 211–214, 234, 245, 293–301, 398–402, 426–31, 438). From the standpoint of balance, even without the guiding rib, the patented valve is superior to the poppet type.

23. The small size of the regulator permitted substantial savings in cost besides other advantages of this characteristic, such as use of the valve in limited space areas. Other advantages of the new device were its high capacity, excellent regulating characteristics and over-all superior performance.

24. In February, 1949 Kern began to sell regulators of the type disclosed in the patent. Because of the noted advantages of this device, it became an immediate and continuing commercial success to the extent that Kern captured thereby a substantial portion of the regulator business.

25. Although the patent was issued in 1954 Kern was not aware of the fact that his patented regulator was balanced until some time after issuance of the patent. That fact and the scientific explanation therefor was first discovered in 1957 by Professor Streeter, of Michigan University, an internationally known hydraulic and fluid flow expert, after a study of the regulator and its performance (R. 439–40, 468–9, 500). In his application for the patent Kern admitted that he could not state with certainty the reason for the superior performance by his smaller regulator which he intended to design for reduction of the pressure drop to a minimum. It was known in the prior art, however, and by Kern prior to development of the new design, that the diaphragm size controls the size of the unit, that a smaller diaphragm would produce a smaller device, but that such reduction in size would affect the quality of performance. Kern stresses in his application the fact that the reduction in size was accomplished in his device without any sacrifice in performance and that such device even gave superior performance.

26. The application for the patent was most carefully scrutinized, examined and re-examined in the Patent Office, as its file history in that Office shows (PX–24, 25).

27. Plaintiff contends that in view of the prior art, available at the time Kern designed his regulator, the structure formed by Kern was obvious. It relies on several references cited and considered by the Patent Office and also on Chapman issued in 1869, entitled "Stop Cock" (PX–16A, R. 124) which was not cited or actually considered. Major emphasis is placed by plaintiff on Carter et al. which was the basic reference relied on by the Patent Office.

28. Patent to Chapman, Scott, Hynes and Murray, (PX–16–A, D, E, F) relate to valve structures in which an exterior force unrelated to outlet pressure is used to operate the valve and, accordingly, valve balance and friction are of negligi-

ble importance as compared with their importance in gas regulators (R. 470–1). There is nothing in these patents to suggest that a gas regulator should have a straight-through gas passage with an axially movable conical valve and seat therein with the axis of the cone disposed at substantially right angles to the axis of the passage. Chapman teaches nothing that the Patent Office did not consider in Scott and Murray which teach that a hand shut-off valve can have either a conical or wedge-shaped valve element; this is all the Chapman teaches.

29. Carter does not even discuss regulation or maintenance of outlet pressure and is primarily concerned with closing of the gas passage. It differs from the patented matter in the following respects:

(a) It has a wedge-shaped valve and seat with no space on the sides for gas flow; gas can flow only over the top and under the bottom of the valve (R. 175). In Kern most of the gas flows around the sides of the valve. (Fig. 4).

(b) Forces acting on the Carter valve cannot be balanced because of the presence of diaphragm "i"; other forces than those found in Kern act on the valve (R. 405, 420, 488).

(c) The valve is self-aligning and non-guided because the loose joint "d" permits it to move sideways or non-axially, preventing effective balancing of the valve (R. 420, 488).

(d) Pressure drop control is by flow through the narrow space between the adjacent flat platelike faces of wedge valve "d" and valve seat E, which is the section of minimum cross-sectional area, rather than through orifices "g". A different law of operation is followed in Kern wherein the pressure drop control is by flow across narrow width orifices provided by the narrow valve seats 17 and 19 (R. 445–7, 452, 488, 512–5).

Substitution of a conical valve and seat as shown in Hynes will affect only difference (a). Hynes also has a restricted section 7–7.

30. Carter does not suggest the subject matter nor can it be modified to produce it without resort to the teaching of Kern.

31. Miller and Jordan (PX–16, G, K) show automatic valves with straight-through gas passages but do not suggest a gas regulator having the patented structure. These references, with Carter, are the only patents asserted by plaintiff as showing automatic regulators with straight-through flow paths intercepted by gate valve constructions. Since there is no evidence that these structures were ever used commercially and some evidence to the contrary (R. 487), these patents are merely paper patents.

32. No prior art reference discloses a gas regulator having a conical valve element positioned in a straight-through flow passage for movement at right angles to the passage or even suggests that such arrangement would have better regulating characteristics, or would permit the regulator to be substantially smaller than a comparable poppet regulator.

33. Prior to Kern, it was not known that a diaphragm positioned valve element with a conical seat would be balanced when positioned in a straight-through flow passage for movement along its axis at right angles to the passage. No such construction is suggested by the prior art and no prior art was produced containing a suggestion that such a construction would have the advantage of excellent regulation with a relatively small diaphragm.

34. Prior to Kern, it was known that globe valves had superior characteristics to gate valves for regulation as control of intermediate flows (R. 373, 487). A poppet regulator is a form of globe valve (R. 33). Plaintiff's witness admitted that he knew of no patent prior to Kern where a conical valve as in Kern, or a valve with a circular base as in the ac-

cused regulator, had been described as a gate valve (R. 135).

35. No evidence was produced to show that a diaphragm operated gate valve was ever used commercially prior to Kern in a straight-through flow passage to assume various intermediate positions between fully opened and fully closed to control fluid flow.

36. One reason for using poppet or globe valves in regulators, prior to Kern, was to eliminate the greater friction which gate valves would introduce and which could not be tolerated with the delicate forces available to act on the diaphragm and move the valve element (R. 487).

37. Inasmuch as the size of a gas regulator is determined by the size of the diaphragm and diaphragm size is determined by the regulating characteristics of the valve and not its capacity, the fact that an ordinary gate valve may be smaller than an ordinary globe valve having the same flow capacity, would not make it obvious that a gas regulator with a gate valve will be smaller than one with a globe valve.

38. There is no prior art showing a guide rib used to prevent displacement of one end of a conical valve (R. 156). Kern claims a rib in engagement with an edge of the outlet side of a valve in order to guide it as it moves along its axis transverse to that of a straight-through passage in a gas regulator. No evidence was adduced to show how a guide rib could be used in a gas regulator nor to suggest the rib feature of claims 4, 6 and 8 of Kern.

39. The art shows that Kern was the first to devise a commercially acceptable regulator in which the movable regulator valve is substantially perfectly balanced with respect to fluid forces acting on the valve in the direction of valve movement without the addition of parts to apply compensating forces to the valve, such as a balancing valve head or a balancing diaphragm in addition to the control diaphragm.

40. Kern was the first to discover and disclose in his patent that a conical valve and seat in a straight-through gas passage with the valve moving along its axis and at right angles to the passage would provide excellent regulation with a relatively small diaphragm as compared with poppet regulators.

41. The conical valve and seat in the environment of the Kern regulator perform the function of the balancing load in a double poppet regulator or the balancing diaphragm type regulator. This is a new and additional function not found in the prior art.

42. The novelty and utility of the claimed combination of elements in Kern and their novel co-action and mode of operation, the history and condition of the gas regulator art including the long-known defect of the universally used poppet regulator and attempted solutions to overcome this defect, the reception accorded the Kern regulator by the trade, as well as the advantages of the patented subject matter over the prior art, warrant an inference that the design of the Kern patent was unfamiliar to those acquainted with gas regulator designs current at the time the Kern regulator was designed and that, a regulator design enjoying the advantages of small size, excellent regulating characteristics, and greater capacity than poppet type gas regulators would have been produced prior to 1946–8 had it been obvious to do so. It has been established that the patented subject matter is a significant advance in the art of gas regulators and that the subject-matter as a whole was not obvious in 1946–8 to a person having ordinary skill in the art.

43. McIntosh, designer of the accused device, first worked on a poppet-type gas regulator but found it did not satisfy his objective of developing a smaller regulator with a higher capacity than regulators then available. He then designed a regulator substantially like the one now sold by plaintiff except that a solid conical valve element instead of plaintiff's present valve element was used. After

Cam-Stat was advised that the design using the solid cone infringed Kern, McIntosh changed the design to the one now employed in the accused regulators (DX–36, Admissions 21–26; R. 38–40).

44. Defendant contends that, in redesigning his regulator, McIntosh merely notched out faces of the cone, retaining the necessary portions of the valve element and eliminating only the minor portions of the cone, and that his present design infringes the Kern patent.

Plaintiff contends that its regulator does not infringe Kern because:

(a) It does not have a substantially conical valve and seat;

(b) Its regulator housing has trapezoidal throat sections and the gas passage is not "substantially unrestricted";

(c) It does not have a housing with a straight-through gas passage; and

(d) It has two guide ribs engaging on the outlet side.

45. Inter partes tests were made by defendant with two of plaintiff's accused regulators in one of which the valve element was replaced with a complete solid cone to form a valve element as used in defendant's regulators (DX–47, 48). Pressure drop capacities were determined with the valves wide open and, therefore, the regulation of the devices with the valves in that position was unaffected. The regulator using defendant's valve showed an improved pressure drop capacity over the Rehrig regulator by about ten (10%) per cent because the solid cone produced less turbulence or resistance to flow than the Rehrig valve (R. 349).

Plaintiff stipulated at the trial that these two regulators were substantially the same in regulating ability, that is, ability to maintain the outlet pressure for changes in inlet pressure and for changes in flow rate (R. 347–9). It did not contend that the mode of operation, the regulating function, or the quality of regulation was altered in any degree by substitution of defendant's for plaintiff's valve in plaintiff's regulator. The re-sults of these tests support defendant's claim that the valve and seat of plaintiff's regulator are full equivalents of defendant's valve and seat.

46. The increased capacity of plaintiff's regulator, with its valve element substituted by defendant's valve, indicates that the valve itself is a major obstruction to flow. When pipes (DX–57) are inserted in the threaded parts of the gas passages it is apparent, by looking through the regulator, that the valve element is the major obstruction to flow and would cause more resistance than the trapezoidal throat sections (R. 490–1). Plaintiff contends (R. 51, 144) that its regulators have a greater wide open or pressure drop capacity than defendant's regulators of the same size. This indicates that its gas passage is less restricted than that of defendant's Kern regulator. The evidence establishes that the gas passage in the housing of plaintiff's regulator is substantially unrestricted.

47. Claims 5, 6, 7 and 8 of Kern do not require the gas flow to follow a straight line through the regulator. Insofar as straightness is concerned, flow through the two regulators during use is the same (R. 315–9). The evidence establishes that the plaintiff's regulator has a straight-through gas passage.

48. Plaintiff admits that the two ribs in its regulator perform the same function as the single rib in defendant's regulator (DX–36, Admission 12 i). Also, Claims 4, 6 and 8 of Kern are not limited to a single rib. The evidence established that plaintiff's regulators have the guide rib feature of Claims 4, 6 and 8.

49. Plaintiff formally admitted that the surfaces of its valve which cooperate with the valve seat include surfaces extending around a major portion of the periphery of the circular base, converging surfaces extending upwardly from diametrically opposed points adjacent to the periphery of the circular base to the top of the valve element and lying at equal distances from the axis of the valve, and portions extending across the top of the valve (DX–36, Admission 12 f).

50. Surfaces of the valve which cooperate with its valve seat are shown in Exhibits DX–44 A, B, C, as they relate to regulators of both parties, by use of yellow lines for plaintiff's regulator and red lines for defendant's device. The only departure of the yellow lines from a true representation of plaintiff's valve is that the slanting edges of the vertical plate are curved as on a true cone rather than flat as on plaintiff's valve. The inter partes test to which reference was made earlier and expert testimony show that this departure is very slight (R. 333) and establish that it is unimportant because it is the leading edge or corner that does the metering or control and the shape of the remainder of the valve has only a minor effect (R. 337–9, 445–447, 451–4). The leading edges of the valve and seat of plaintiff's regulator lie on the surface of a cone. (R. 445–6, 450, 453, 455). Lines in both colors on the exhibits conform substantially to, or actually lie on, the surface of a cone. Also, Exhibits 45 and 46 which represent, respectively, valve seats for defendant's and plaintiff's valves, show that they conform to the surfaces of their respective valves.

51. Claims of the Kern patent call for a valve and seat that are substantially conical. "Conical" means pertaining to a cone. Plaintiff's valve and seat pertain to a cone. The operative portions thereof (those which cause the pressure drop) lie on the surface of the cone, and they are, therefore, at least substantially conical (R. 445–455), and these claims of Kern describe plaintiff's structure.

52. In the construction of the regulators of both parties the following characteristics are common to both:

(a) Gas flows in substantially the same way around the sides, top, and bottom of the valve;

(b) There is a pressure drop in gas at the inlet and at the outlet side of the valve and seat, so that gas pressure under the valve and acting upwardly on the valve is less than the inlet pressure and more than the outlet pressure:

(c) Components of high inlet as well as low outlet pressure act downwardly on substantially equal areas on the top of the valve, tending to open it, and these are substantially balanced by the mean pressure acting on the bottom of the valve, tending to close it. These forces, along with the force of the spring tending to open the valve and the force of the diaphragm tending to close it, are the only forces acting on the valve which tend to open and close it.

In both structures a unique and unobvious combination of forces on the valve balances the valve and results in regulating characteristics superior to those of the poppet type, whereby both regulators can be made smaller in size and, consequently, lower in cost than comparable poppet regulators (R. 318–9; DX–36, Admission 12 e; 350–372; R. 439, 443, 516; R. 293–4; R. 427; R. 438–9; R. 454–9).

53. Plaintiff formally admitted (DX–36, Admissions 12 g, h) that the circular base is a part of its valve that cooperates with the valve seat and that the distance between its valve and seat is inversely related to and dependant upon the outlet pressure. Such admissions establish that the distance between the base of plaintiff's valve and its seat will vary with outlet pressure. By way of testimony and a demonstration to the Court (R. 462–466; R. 336–7, 351–2, 414–5; R. 445, 450, 454–5, 466, 498, 507, 516) and by using dimensions on plaintiff's drawings (PX–5 B, C), it has been established that the base of plaintiff's valve meters or regulates and forms a part of the control, and that such base is a functioning part of plaintiff's valve.

54. Testimony of well qualified experts, based on an analysis of the structure and mode of operation of performance of the patented and the accused regulators, establishes that the method and principles of operation of both are identical, that there is no difference in the principle upon which both valves are balanced, and that there is a substantial

identity between plaintiff's regulator and that of the Kern patent (R. 467, 516).

55. The differences between plaintiff's regulator and the Maxitrol regulator of the Kern patent are differences in design and not in principle. In each the same elements coact in the same way to produce the same result, the two regulators are substantially identical in structure, operation, and performance, and plaintiff's regulator is the full equivalent of the patented regulator.

## CONCLUSIONS OF LAW

1. The Kern patent in suit is presumptively valid. This presumption has not been overcome by plaintiff. The application for the patent was subjected to very close scrutiny by the Patent Office and plaintiff is asserting no prior art different from that which the Patent Office considered. The Kern regulator met with exceptional commercial success. The evidence shows that elements of the regulator coact in a novel manner to produce a regulator of small size, low cost, and superior regulating characteristics. These factors strengthen the presumption of validity. 35 U.S.C. § 282; 69 C.J.S. Mortgages §§ 409–410, 412–413 583–585, 588–590; General Electric Co. v. Save Sales Co., 82 F.2d 100 (6 Cir. 1936); Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 106 F.2d 554 (6 Cir. 1939); Williams Mfg. Co. v. United Shoe Machine Corp., 121 F.2d 273 (6 Cir. 1941) affirm. 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537; Modern Products Supply Co. v. Drachenberg, 152 F.2d 203, (6 Cir. 1945) Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828 (6 Cir. 1956); Coats Loaders & Stackers, Inc. v. Henderson, 233 F.2d 915 (6 Cir. 1956); 69 C.J.S. Mortgages §§ 409–410, 412–413, 583–585, 588–590.

2. The subject-matter covered by the Kern patent in suit satisfies the statutory conditions for patentability set forth in Sections 102 and 103 of Title 35, U.S. Code.

3. The claims of the Kern patent call for a substantially conical valve and seat. The valve of the Kern patent is a truncated cone. The seat is not a complete cone but is conical in the sense that its operative portions lie on the surface of an imaginery cone. As the patent points out, the valve has a surface which co-operates with the valve seat. The portion of the valve surface which cooperates with the valve seat is not a complete cone but conforms to the surface of a cone. The term "conical" is defined as "of or pertaining to a cone", hence the language of the claims does not require that the valve or valve seat be a cone, and such language is satisfied by a valve and seat whose operative portions which engage each other conform substantially to the surface of a cone. Webster's New International Dictionary, 2nd Ed. 1956.

4. The operative portions of the valve and seat of the accused regulator which engage each other when the valve is closed conform substantially to the surface of a cone; the accused regulator provides a straight-through substantially unrestricted flow passage in the same sense as and at least to the same degree as the patented regulator; all elements of the accused regulator cooperate with each other in the same manner, function in the same way, and perform the same regulating function to obtain the same results as the corresponding parts of the Kern patented regulator. Plaintiff's accused regulator is, therefore, the substantial equivalent of defendant's regulator and infringes the Kern patent in suit. Winans v. Denmead, 15 How. 330, 56 U.S. 330, 14 L.Ed. 717 (1853); Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929); E. H. Bardes Range & Foundary Co. v. American Engineering Co., 109 F.2d 696 (6 Cir. 1940); Great Lakes Equipment Company v. Fluid Systems Inc., 217 F.2d 613 (6 Cir. 1954).

5. Regardless of whether the valve of the accused regulator can be considered conical, it functions in the same manner as the valve of the Kern patent, it is balanced in the same manner and for the same reason, it imports to the accused regulator the same advantages of small size and excellent regulating characteris-

tics, and it produces the same result. Accordingly, the accused regulator is a full equivalent of the patented regulator and infringes the patent. Union Paper Bag Mach. Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935 (1877); Continental Paper Bag Co. v. Eastern Paper Bag. Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1934); Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1949).

■ 6. It is immaterial that the patentee, Kern, did not fully understand the scientific theory which explains why the valve in his regulator was balanced. It is also immaterial that the fact of balance was not mentioned in the patent because that characteristic is inherent in the construction and performance of the regulator as disclosed in the patent and is largely responsible for its superior performance which was recognized by Kern and is set forth in the patent. 69 C.J.S. Patents § 53, p. 268; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911).

■ 7. It is immaterial that plaintiff has a patent on the accused regulator or that it may have improved upon or impaired the function of the Kern regulator because there is no departure in the accused regulator from the basic concept and mode of operation of the Kern regulator. 69 C.J.S. Patents § 68, p. 295; Gordon Form Lathe Co. v. Walcott Machine Co., 32 F.2d 55 (6 Cir. 1929); Clarage Fan Co., v. B. F. Sturtevant Co., 148 F.2d 786 (6 Cir. 1945); Reynolds Spring Co. v. L. A. Young Industries, 36 F.2d 150 (6 Cir. 1929).

8. Claims 4, 6 and 8 were granted by the Patent Office as inventively different from the remaining claims in the patent because of the feature claimed only in these claims of the guide rib or vertical surface that continuously engages an edge of the conical valve on the outlet side to prevent transverse deflection of the valve. This feature is novel. Plain-

tiff introduced no evidence to show that it is obvious and, accordingly, there is nothing in the record to rebut the presumption of validity as to these claims. Plaintiff's contention that it does not infringe because it has two ribs on the outlet side is not well taken because they perform the same function as the single rib. Furthermore, these claims are not limited to a single rib. These claims are, therefore, valid and infringed by the accused regulator.

■ 9. Claims 1–8 of the Kern patent No. 2,668,396 in suit are valid and have been infringed by plaintiff.

■, An order may be entered dismissing plaintiff's complaint with prejudice and granting to the defendant the injunctive relief, accounting of damages as prayed for and costs. The Court does not find from the evidence such elements of willful nature of the infringement to justify treble damages as demanded by defendant.