**VULCAN, INC., Plaintiff,**

v.

**FORDEES CORPORATION, Defendant.**

**No. C 75-54 Y.**

United States District Court,
N. D. Ohio, E. D.

Feb. 16, 1978.

Paul A. Weick, Akron, Ohio, Arland T. Stein, Pittsburgh, Pa., for plaintiff.

Edward D. Crocker, Cleveland, ·Ohio, C. A. Covington, Jr., Youngstown, Ohio, Thomas H. Murray, Lawrence G. Zurawsky, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAMBROS, District Judge.

### INTRODUCTION

The essence of this action is patent infringement. The patent in issue is U.S. Patent No. 3,166,154, granted January 19, 1965 (the "Titzel patent"). The accused devices are portable work towers ("reline towers") manufactured by Fordees Corporation ("Fordees"). This action involves both the questions of validity and infringement of the Titzel patent. Plaintiff has asserted that a prior consent judgment is dispositive of the issue of validity. Further, contending that later Fordees devices were equivalent to those previously declared infringing, plaintiff contends the pri-

or judgment is also dispositive of the question of infringement.

While the issues relative to the consent judgment may be dispositive of this action, this cause came on to be heard not only upon those issues associated with the consent judgment, but also upon the issues of validity and infringement considered separate and apart from the consent judgment, solely as to the relationship of each of these issues to the question of liability in this action.

### FINDINGS OF FACT

1. Plaintiff Vulcan, Inc. ("Vulcan") is a Pennsylvania corporation having its principal place of business at Latrobe, Pennsylvania. Plaintiff's Vulcan Engineering Division is by acquisition, merger and change of name successor to Titzel Engineering, Inc. ("Titzel Engineering").

2. Defendant Fordees Corporation is an Ohio corporation having its principal place of business at Leetonia, Ohio.

3. The Titzel patent was issued to Titzel Engineering as assignee of John M. Titzel. Titzel Engineering was plaintiff's predecessor in title. John M. Titzel is the originator of the subject matter described and claimed in U.S. Patent No. 3,166,154.

*Nature of the patent.*

4. Basic oxygen furnaces, used for the purpose of making steel, have refractory linings to retain molten metal and to insulate the vessel from overheating during processing. Over a period of use, these refractory linings are gradually eaten away. Every so often, such vessels must be taken out of service and the refractory lining replaced.

5. Before the concept of reline towers, relining of basic oxygen furnaces was done by use of scaffolding which was built up piece-by-piece. The process of relining then required one set of people building the scaffolding and another set of people to perform the actual relining. The scaffolding would be built up several feet, and then the

refractory lining would be built up several feet. This procedure was repeated until the vessel was completely relined. Upon completion of the relining, the scaffolding was disassembled and removed from the vessel. This method of relining took several days, with concomitant loss of steel-producing capacity. The method required use of the overhead mill crane to lower refractory bricks to the workmen. The method involved lowering pallets of these bricks directly over the heads of workmen, with corollary potential danger.

6. The Titzel patent is for a portable work tower, called a "reline tower", for use in the rebuilding of refractory lining in basic oxygen furnaces. The patent contains four claims, three of which are dependent on Claim 1. Claim 1 is the only independent claim and the one charged to be infringed. Claim 1 defines the invention of the Titzel patent as follows:

1. A portable work tower particularly adapted for use in vessels having an opening smaller than the interior comprising an elongated tower means adapted to pass through the opening in said vessel and be normally free standing, said tower means including upper and lower portions having spaced apart vertically extending members at the corners of a quadrangle, said vertically extending members on the lower portion being provided with carrier means vertically movable thereon, base means on the lower portion adapted to engage the vessel bottom at spaced apart adjustable level points whereby the tower may be levelled and supported, a plurality of support arms spaced about said carrier means and pivoted thereon from a position parallel to the lower portion of the tower to a position transverse to the tower means to form a working platform, spaced cage guides within the upper and lower portions forming an inner cage guide extending from adjacent one end of the tower to the opposite end of said tower, cage means vertically movable on said cage guides within the upper and lower tower portions and lift means on the tower means selectively raising and lowering the cage means, said cage means being selectively coupled with said carrier means for raising and lowering said carrier means with said cage means.

7. The salient features of the Titzel patent are, in combination: (i) a radially foldable working platform formed by support arms mounted on a carrier means that can be moved vertically along vertically extending frame members and selectively locked at numerous locations and work levels; (ii) a guided cage inside the vertically extended members for carrying refractory brick and other materials in bulk into the vessel to the working platform through the interior of the tower, and (iii) selective coupling of the guided cage to the working platform to raise and lower the working platform to different elevations within the vessel by the same lift means used to raise and lower the cage without affecting the structural rigidity of the tower.

8. Reline towers of the sort set forth in the Titzel Patent substantially changed the practice in relining a basic oxygen furnace. They are integral, free-standing machines, which can be inserted through the narrow opening in a furnace vessel in one piece. They eliminate the danger to workmen from falling brick; they eliminate the need for workers to build and disassemble scaffolding; they eliminate the need for use of the overhead crane during the relining operation; and they reduce the time required to perform relining, with a concomitant increase in potential steel production.

9. The reline towers of the Titzel patent were quickly adopted and have achieved continuous wide-spread use since 1961.

10. The combination of elements in the Titzel structure produces a result of great practical value in relining basic oxygen furnaces.

11. The file history of the Titzel patent shows original rejection of claims which included base means for support and for adjustably positioning the tower vertically. After amendment of claims 1, 3, 5 and 7 to reflect base means on the tower adapted to engage the vessel bottom and provide sup-

port for the tower, Titzel's application for patent was still rejected. Titzel's application was granted only after Titzel amended his application by cancelling all claims and setting forth an entirely new set of claims.

*Fordees' relationship with M&G.*

12. Titzel Engineering, the predecessor to Vulcan, brought an action against M&G Industrial Associates, Inc. (M&G) and Robert N. Munroe (Munroe) on November 23, 1970. This action was brought in the United States District Court for the Western District of Pennsylvania as Civil Action No. 70–1333. The action was for infringement of the Titzel patent. Plaintiff in that action claimed infringement on the basis of the manufacture and sale of reline towers by M&G.

13. In early 1971 Mr. Munroe, of M&G, advised Mr. Sause, President of Fordees, of the Titzel patent. At that time Fordees, M&G and Titzel Engineering were all bidding against one another for a contract to provide a reline tower for the United States Steel Corporation (U.S. Steel). This reline tower was to be used at U.S. Steel's Gary Works (BOP No. 2).

14. Fordees' bid was accepted by U.S. Steel through a purchase order dated March 9, 1971. As a condition of the contract, Fordees agreed to hold U.S. Steel harmless from any infringement specifically by reason of the Titzel patent.

15. Prior to successfully bidding on the U.S. Steel contract, Fordees had never built a reline tower for a basic oxygen furnace. Fordees bid for the U.S. Steel contract largely on the basis of a drawing characterized as a "cartoon". This drawing could not have been used to build an actual reline tower.

16. After successfully bidding on the U.S. Steel contract, Fordees purchased the only set of engineering drawings M&G appears to have sold setting forth how to build an M&G reline tower. Fordees purchased these drawings with full knowledge that the reline tower set forth by the drawings was the subject of pending litigation against M&G for infringement of the Titzel

patent. After purchasing the drawings, Fordees obtained additional engineering and technical assistance from M&G in relation to construction of the M&G reline tower.

17. M&G did not make reline towers, but subcontracted that work to others to build in accordance with engineering drawings M&G supplied. M&G's prime asset in relation to reline towers was its engineering drawings, which expressed the combined efforts of its engineers and in addition to fully detailing the reline tower, stated the details of the components to be made and the descriptions and suppliers of the components to be purchased.

18. Because of the patent infringement litigation on the Titzel patent, Fordees insisted upon and received from M&G, in addition to the M&G reline tower engineering drawings, an indemnity over the signature of Munroe.

19. Fordees received reproducible copies (mylars) of the engineering drawings of M&G to the reline tower shown in Plaintiff's Exhibit 55. Fordees' engineer, Mr. Hively, reviewed the drawings and secured additional engineering drawings and information.

20. Fordees made its first reline tower for the Gary Works (BOP No. 2) of U.S. Steel largely in accordance with the M&G engineering drawings. The only differences were dimensional changes to fit the tower to the particular furnace vessel and certain changes made at the direction of U.S. Steel.

21. On October 14, 1971, the United States District Court for the Western District of Pennsylvania entered both a stipulation upon entry of a consent decree and a consent decree ending the litigation involving M&G and Munroe as defendants and Titzel Engineering as plaintiff. The consent judgment found the Titzel patent valid and infringed. In the judgment, M&G and Munroe agreed to a finding that the reline tower set forth in the engineering drawings supplied by them to Fordees infringed the Titzel patent; and in accordance with the

judgment, delivered up to Vulcan copies of those engineering drawings, which are here in evidence as plaintiff's exhibit 55. The judgment found that five reline towers infringed the Titzel patent, four of which were made by M&G and one of which was made by Fordees in connection with M&G.

22. As part of the settlement, the plaintiff agreed to release defendants from any infringing acts prior to the date of the settlement, with a view to releasing Fordees from liability on the reline tower then in construction for the U.S. Steel Gary Works.

23. M&G closed its business upon entry of the consent judgment, and Munroe got out of the reline tower business in favor of becoming involved in a steel fabricating firm.

*Comparison of Fordees Reline Towers with M&G Reline Tower.*

24. In 1973, Fordees began making additional reline towers with full knowledge of the existence of the Titzel patent and with full knowledge of the 1971 consent judgment. Fordees bid and received a contract to build a second reline tower for the Gary Works (BOP Shop No. 1) of U.S. Steel. Fordees gave U.S. Steel a hold harmless against patent infringement, specifically mentioning the Titzel patent.

25. The second reline tower built by Fordees for the Gary Works of U.S. Steel was (and is), in relation to the Titzel patent, equivalent in every respect to the first reline tower made by Fordees for the Gary Works of U.S. Steel and to the M&G reline tower shown in Plaintiff's Exhibit 55 and adjudicated to infringe by the consent judgment. The Fordees second reline tower, as well as the Fordees first reline tower and the M&G reline tower adjudicated to infringement, were portable work towers particularly adapted to be transported by the overhead mill crane and to pass through the narrow opening in the top of a steelmaking vessel. The towers are designed to operate without continuous support from an overhead crane. The towers each had spaced apart vertically extending members at the corners of a quadrangle, a vertically moveable carrier provided on the lower portions of the tower within the vessel, a plurality of support arms spaced about the carrier and pivoted thereon from a position parallel to the lower portion of the tower to a position transverse to the tower to form a working platform, spaced cage guides within the upper and lower portions of the tower forming an inner cage guide extending from adjacent one end of the tower to the opposite end of the tower, a cage vertically moveable on the cage guides within the upper and lower portions of the tower which can be raised and lowered in conjunction with a lift hoist on the tower, and means for connecting the carrier with the cage for raising and lowering the carrier and working platform with the cage and the same lift hoist.

26. The second and subsequent Fordees towers differed from the M&G and first Fordees tower in only one significant respect: the later Fordees towers had no base stabilizing means. Neither the shock absorbers on the elevator cage nor certain screws on the scaffold of the later Fordees reline towers comprise the recited base means of the first claim of the Titzel patent.

27. Both the M&G and Fordees reline towers were primarily supported from the service floor.

28. Since the consent judgment, Fordees has also built reline towers substantially equivalent to the M&G design for CSN and Youngstown Sheet and Tube Company. These third and fourth reline towers were (and are) equivalent in every respect to the second reline tower made by Fordees.

29. Fordees is also presently building or has built a fifth reline tower similar to the M&G design for the Burns Harbor Works of Bethlehem Steel Corporation. The tower is of substantially the same design as Fordees' second reline tower except it has four doors on the carrier at the working platform instead of two doors.

30. Notwithstanding lack of inclusion of base means support as set forth in the claim

of the Titzel patent, Fordees' second and subsequent reline towers appropriate the basic principle and mode of operation of the device set forth in the Titzel patent. Both the Fordees' towers and the Titzel reline tower obtain their results by the same or equivalent means.

31. While Fordees' towers employ a different method for selectively coupling or connecting the carrier means with the cage means than that method set forth in diagrams appended to the claims of the Titzel patent, the Fordees towers nonetheless employ the same concept of coupling the two means to raise or lower them together by a single hoist. The modes of operation of the patented tower and Fordees' towers in this respect, notwithstanding substitution of retractable table beams for hooks and latches, are equivalent.

32. Each of the reline towers made by Fordees after the consent judgment, like the reline towers made by it and M&G previously, is "normally free-standing" as called for by claim 1 of the Titzel patent. "Free-standing" requires that the structure remain stable in position without the use of support means such as cables, overhead cranes and special frames brought in for the specific purpose of holding it in place. Each of the Fordees reline towers is stable in position on a primary foundation at the service floor with various means to stabilize and support the tower within the vessel. Admittedly, no cables, braces, overhead cranes or other ancillary devices are brought in for the specific purpose of maintaining the stability of the structure. The requirement that the tower be free standing does not require or imply that the structure is totally supported from its bottom or base.

33. The greater rigidity claimed of the Fordees towers is not a significant difference between Fordees' and Vulcan's towers, notwithstanding the addition of certain cross-bracing.

*Base Means Support.*

34. Titzel's original claims were rejected as unpatentable. The application's indepen-

dent claims were then amended to call for base means support, with the remark that the device was the first to provide its major support from the bottom and entirely eliminate all top support. This remark was erroneous on the record then before the Patent Office because the amendatory language was not limited to provide major support from the vessel bottom, claims five and seven then before the Patent Office required outrigger members, and the application taught levelling means at the top of the tower and in the outrigger.

35. The Patent Office specifically rejected these proposed claims and remarks on October 30, 1963.

36. The applicant then redefined and reworded his claims, completely substituting all prior claims with what is now the Titzel patent. The claims as issued did not require that the tower have its major support to be supported solely from the bottom of the vessel. Prior claims and remarks to that effect were rejected before applicant amended his claims, and were not relied on by the Patent Office in finding patentability.

37. The patent as issued does not solely teach base means support. As issued, the patent describes a reline tower that is free-standing. Each of the reline towers that are the subject of this action are in conformity with and satisfy the essential claim of the Titzel patent. Defendant's accused reline towers incorporate the equivalent structure described and claims in the Titzel patent.

## CONCLUSIONS OF LAW

██ A consent judgment binds not only the named parties to the judgment, but also those in privity with them. *Schlegel Manufacturing Co. v. USM Corp.,* 525 F.2d 775 (6th Cir. 1975), *cert. denied,* 425 U.S. 912, 96 S.Ct. 1509, 47 L.Ed.2d 763 (1976); *Brunswick Corp. v. Chrysler Corp.,* 408 F.2d 335 (7th Cir. 1969); *Crane Boom Life Guard Co. v. Saf-T-Boom Corp.,* 362 F.2d 317 (8th Cir. 1966), *cert. denied,* 386 U.S. 908, 87 S.Ct. 853, 17 L.Ed.2d 782 (1967).

A holding in a consent judgment that a patent is valid and infringed is res judicata as to the parties and their privies on the issue of validity of the patent in subsequent litigation. *Schlegel Manufacturing Co. v. USM Corp., supra; Broadview Chemical Corp. v. Loctite Corp.,* 474 F.2d 1391 (2d Cir. 1973); *United States ex rel. Shell Oil Co. v. Barco Corp.,* 430 F.2d 998 (9th Cir. 1970).[1]

█ Where, as here, during the pendency of a patent infringement suit, Fordees acquired from the defendant in the suit property rights to designs and engineering and technical assistance permitting Fordees to manufacture the device which is the subject of that suit; where such acquisition is made with full knowledge of the pendency of the suit; where the defendant in the suit agreed to indemnify Fordees for any damages resulting from Fordees' infringement of the patent in suit; where a consent judgment was negotiated in the action which benefitted Fordees; and where the consent judgment holds the patent valid and infringed; the Court finds Fordees is in privity with the defendant in the suit. See *Schnitger v. Canoga Electronics Corp.,* 462 F.2d 628 (9th Cir. 1972); *J. R. Clark Co. v. Jones & Laughlin Steel Corp.,* 288 F.2d 279 (7th Cir. 1961), *cert. denied* 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 32 (1961); *Alb, Inc. v. Noma Lites, Inc.,* 231 F.2d 662 (2d Cir. 1956).

Therefore, Fordees was in privity with M&G as to the consent judgment. Where a party is bound by a prior consent judgment decreeing validity and infringement of a patent, the prior judgment is res judicata on the question of patent validity. The only issues remaining are enforcement of the decree and infringement by new models. *Brunswick Corp. v. Chrysler Corp., supra.*

The major differences in form between Fordees' second and subsequent towers and the reline tower of the Titzel patent are: (1) the selective coupling of the cage and carrier means, while existent in both towers, is achieved differently, and (2) Fordees' second and subsequent towers have no base means support.

The difference in method employed to achieve selective coupling is merely a difference in form, and does not take the Fordees towers outside the scope of the claim of selective coupling set forth in the Titzel patent. Further, this difference in selective coupling does not affect the principle or mode of operation of the patented device.

The lack of base means support in Fordees' second and subsequent towers does indeed result in the omission of one element of a claim of the Titzel patent. However, this omission does not materially affect the principle or mode of operation of the patented device.

█ Incorporation of each and every element, without exception, of every claim of a patented structure is not an absolute prerequisite to a finding of infringement by an accused structure. *Clarage Fan Co. v. B & F Sturtevant Co.,* 148 F.2d 786 (6th Cir. 1947); *see also Abbott v. Barrentine Manufacturing Company,* 255 F.Supp. 890 (N.D. Miss.1966). In the instant case, while omitting one and only one element of one claim of the patent, Fordees' reline towers are based on the same principle and operate in the same manner as the patented reline tower. Although form has added weight in determining infringement where it is the essence of the invention, mode of operation is always a relevant consideration where the patented structure has operational characteristics. *National Rolled Thread Die Company v. E. W. Ferry Screw Products, Inc.,* 541 F.2d 593 (6th Cir. 1976).

█ To the extent there has been resort to the doctrine of equivalents in finding infringement of later devices, file wrapper estoppel does not preclude a finding of infringement. The facts on which defendant asserts such estoppel do not form adequate foundation for its application. See *Kearney*

---

1. The doctrine of res judicata thus bars all defendant's defenses as to validity, such as fraud on the patent office, want of adequate specifications, lack of utility, anticipation, and obviousness.

& *Trecker Corp. v. Cincinnati Milacron, Inc.,* 403 F.Supp. 1040, 1045–46 (S.D.Ohio 1975). Those erroneous representations regarding base means support on which defendant relies in raising file wrapper estoppel were rejected, and complete rewording and change of emphasis of the claim were required by the Patent Office to achieve patentability.

As a general rule, the validity of a patent is a matter of public importance which should always be fully explored. *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc., supra; Preformed Line Products Co. v. Fanner Manufacturing Co.,* 328 F.2d 265, 267 (6th Cir.), *cert. denied,* 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964). However, this Circuit has held that a consent decree adjudicating validity and infringement of a patent is res judicata as to the parties and their privies, on the basis that the judicial involvement in a consent decree is sufficient, in terms of the public interest, to justify application of the doctrine of res judicata to the parties and their privies. *Schlegel Manufacturing Co. v. USM Corp., supra.*

Accordingly, the Court views the consent judgment as controlling, finds said consent judgment res judicata as to defendant Fordees, and declares the Titzel patent valid as to this defendant. Further, the Court finds that Fordees' second and subsequent towers under the terms and conditions of the prior consent judgment, infringe the Titzel patent.

The Court finds this is not an exceptional case warranting award of attorney fees pursuant to 35 U.S.C. § 285. The Court defers its decision on whether to increase damages under 35 U.S.C. § 284 until such time as an accounting has been made.

Validity and infringement having been found pursuant to the previous consent decree, the only issue remaining is that of an accounting. Thus, this is an appealable interlocutory decision under the terms and provisions of 28 U.S.C. § 1292(a)(4).

The Court defers ordering the parties to proceed to an accounting until such time as any appeals from this order have been completed.

IT IS SO ORDERED.