## CLARAGE FAN CO. v. B. F. STURTEVANT CO.

### No. 9757.

Circuit Court of Appeals, Sixth Circuit.

April 4, 1945.

As Amended May 22, 1945.

See also 50 F.Supp. 157.

Otis A. Earl, of Kalamazoo, Mich. (Earl & Chappell and Otis A. Earl, both of Kalamazoo, Mich., on the brief), for appellant.

Harry Dexter Peck, of Providence, R. I. (Harry Dexter Peck, of Providence, R. I., Melvin R. Jenney, of Boston, Mass., and Frank E. Liverance, Jr., of Grand Rapids, Mich., on the brief), for appellee.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

Suit by B. F. Sturtevant Company (herein called Sturtevant or appellee) against Clarage Fan Company (herein called Clarage or appellant) for infringement of patent No. 1,846,863 (herein called No. 863), for "Fan and' Method of Operating the same" issued to Hagen, February 23, 1932, and for infringement of patent No. 1,989,413 (herein called No. 413) issued to Hagen, January 29, 1935, for a "Centrifugal Fan."

In an amended complaint Sturtevant based its suit on claim 2 of No. 863 and the four claims of No. 413 and sought to hold Clarage bound from contesting these claims because of a decree of validity and infringement thereof by the Circuit Court of Appeals for the First Circuit in B. F. Sturtevant v. Mass. Hair & Felt Co., 1 Cir., 122 F.2d 900, and 1 Cir., 124 F.2d 95.

The chief defenses to the original complaint were invalidity, anticipation and non-infringement, and to the amended complaint that Clarage's Exhibits B and C charged to infringe were not substantially identical with the apparatus held to infringe in the First Circuit case, herein called the Massachusetts case, and in evidence in this case as Sturtevant's Exhibit 3, and that the claims were so limited in the Massachusetts case as not to cover the apparatus illustrated in Exhibit B.

The District Court held that the validity of the patents in suit and their infringement by Exhibit 3 was res adjudicata; and adjudged that claim 2 of No. 863 and claims 1 to 4 inclusive of No. 413 were infringed by said Exhibit 3 and by Clarage's Exhibits B and C which represented only slight modifications of the apparatus (identical with Exhibit 3) held to infringe in the Massachusetts case.

In the Massachusetts case the Master and Court both found No. 863 valid and infringed as to claim 2 and invalid as to claim 1 and No. 413 invalid. The Court of Appeals upheld the holding as to No. 863 but reversed the decree as to No. 413 and adjudged the four claims thereof to be valid and infringed. Following the decree of the Court of Appeals, Sturtevant disclaimed claim 1 of No. 863 and that claim is not involved here. All claims in suit are for apparatus.

Patent No. 863 calls for "a fan and method in which the power may be varied at constant speed while maintaining a high efficiency."

Patent No. 413, a refinement of No. 863, calls for a centrifugal fan "in which the fluid may be admitted directly from the atmosphere and which has provision for imparting a controllable spin velocity to regulate the output of the fan."

In systems, in which fans either forced or pulled air through passageways, it was often desirable to vary the air pressure.

This had been achieved in the past by the use of controls or dampers within the passageways themselves, but this involved wastage because the fans would continue to develop maximum pressures.

Another system used a variable speed motor and was efficient only if the motor operated on direct current or if a steam turbine was used to drive the fan. But where an alternating current was used, pressure control required auxiliary electrical control apparatus to change the speed of the motor, and a motor so equipped was costly and inefficient.

The Hagen patents, however, utilized a third principle, called spin control. The principle of spin control was very old and in the Massachusetts case, claim 1 of No. 863, a method claim (not in issue here), embodying an extension of the principle to a commercial situation, was held invalid for anticipation.

The Hagen patents used a constant speed motor in connection with a fan having an arrangement of vanes at its inlet which could be adjusted to impart a spinning motion to the entering air in such manner that the pressure of the air in the system could be varied to meet shifting needs. As the vanes were adjusted to vary the spin of the air, the power input of the motor also varied, even though it continued to run at constant speed. (By analogy, a boy pulling a wagon at constant speed, exerts more energy on a hill than on level ground.) The savings in power by motor and fan assemblies using vane control were appreciable and undisputed.

### PATENT No. 863.

This patent revealed an induced draft fan with a scroll-shaped inlet at each side of the impeller, around which was arranged a circular collar of curved, movable vanes which overlapped in closed position and were mounted parallel to the axis of the fan. In the wide open position of the blades the air tended to enter the eye of the fan largely in a radial and axial direction. In that position the operation was similar to that of the ordinary centrifugal fan, and the maximum force was exerted by its blades on the air. It was the position used when the maximum demand for air volume was placed on the fan. As the vanes were moved from the open toward the closed position, they imparted an increasing spin velocity to the air, which tended to approach the linear velocity of the blades them-

selves and reduced the work done by them and by the motor. If the spin velocity equalled the linear velocity, the work done by the fan would be zero. However, even to approach such identity of velocities would require careful machining and adjustment of the fan blades, and such nicety was not demanded by industry. Hagen's testimony was that, if by spin control, the action of the fan was reduced to 30% of its capacity, that minimum would be commercially acceptable.

The specification of No. 863 states that when the vanes are completely closed, they overlap in such a way as to form a practically continuous surface—

"In other words, the fluid directing surfaces of two adjacent vanes overlap in closed position and are substantially parallel for all other positions, that is, they are as nearly parallel as they can be made having regard for the angular displacement of the vanes about the periphery of the eye. As the vanes close, the fluid directing surfaces come into closer parallelism until when completely closed, they form a complete ring about the eye of the fan. The practical parallelism of the surfaces of adjacent vanes forms between them a fluid directing throat of substantially uniform cross-sectional area, which assures the entrance of fluid into the fan with the proper and definite angle approaching tangential admission as the vanes are closed."

Claim 2 follows, to wit:

"The combination with a constant speed motor, of a centrifugal fan having a rotor, an inlet, a plurality of vanes in the inlet forming fluid directing passages to admit fluid to the rotor with a spin component of velocity in the direction of rotation of the rotor, the vanes being adjustable to vary the output of the fan through a range from maximum capacity with the vanes open to a minimum capacity with a substantially tangential admission of fluid when the vanes are closed, *adjacent vane surfaces continuously approaching parallelism and having extended overlapping portions shaped to define passages of substantially uniform cross-section as the vanes are moved toward closed position."* (Italics ours.)

Exhibit 3, held to infringe in the Massachusetts case, was a forced draft fan with a necessarily different arrangement of vanes. There was no scroll at the end of a series of ducts as in No. 863, but conical

or torus shaped openings around the axis of the rotor on each side thereof. The individual vanes were mounted in radial fashion around the axle of the rotor, were flat and somewhat wedge-shaped, and revolved on their long axis instead of across the long axis, as in the curved blade of No. 863. Each set of blades was journaled at the narrow end on a fitting or hub on the rotor axle and at the broad end in the conical or torus shaped housing. The blades were mounted substantially at right angles to the wall of the inlet and obliquely to the axis of the rotor. In wide open position, each vane appeared to be in a plane which could be passed through the axle and offered little obstruction to the free passage of air. The vanes were geared to be opened and closed simultaneously. In closed position, the wide part of the vanes overlay each other in a "shingling" relationship; but this overlying became progressively less toward the narrow ends, and there was testimony that there was a slight space between the vanes there. But as they were brought toward the closed position, the vanes approached parallelism and defined passages of substantially uniform cross-section therebetween.

Structures B and C also had conical inlets with vanes arranged radially around the rotor axis, with their own axes substantially at right angles to the wall of the inlet and oblique to the rotor axis. The vanes of each structure were connected by a common gearing and could be adjusted simultaneously. Each resembled Exhibit 3, both in appearance and mounting, but each represented a slight departure therefrom in the shape of its blades. Downs, Chief Engineer of Clarage, testified as to the difference between Exhibit 3 and Exhibit B that the latter had "half oval strips near the edges of the blades, and * * * some difference in the dimension of the flat area in the blades." The District Judge found, "One strip was placed on one side or outer surface of a vane along one radial edge and another strip was placed on the other side or inner surface of the vane along the other radial edge. Thus as the vanes are moved toward closed position the added strip on the inner surface of one vane approaches close to the added strip on the outer surface of the next adjacent vane."

In response to a question as to the difference between Exhibits 3 and C, Downs testified: "Exhibit C has an appreciable open space between the radial edges of the blades as compared to the space between the radial edges of the blades in Exhibit 3." That is, in closed position, there was a small space or gap between the edges of adjacent vanes their entire length. The changes embodied in both B and C, Downs testified, were made to make the control function like the prior art.

It seems clear from the testimony and diagrams that in closed position, the vanes of neither had the shingling or overlying position of the vanes in No. 863 or in Exhibit 3. However, the adjacent surfaces of the vanes of Exhibit C certainly tended to approach parallelism, and the vanes of both Exhibits, as they were moved toward closed position, defined passages of substantially uniform cross-section.

We come now to the question of res adjudicata.

The leading case upon that subject is Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195. The general rule since followed is quoted from the Cromwell case in United Shoe Mach. Corporation v. United States, 258 U.S. 451, 458, 42 S.Ct. 363, 365, 66 L.Ed. 708, as follows:

" '* * * there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action, * * * concluding parties and those in privity with them, not only as to every matter which was offered, and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. * * * But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined.' "

In the United Shoe Machinery Corporation case, the court continued (258 U.S. 459, 42 S.Ct. 366, 66 L.Ed. 708)—

"In other words, to determine the effect of a former judgment pleaded as an estoppel, two questions must be answered: (1) Was the former judgment rendered on the same cause of action? (2) If not, was some matter litigated in the former suit determinative of the matter in controversy in the second suit? To answer these questions, we must look to the pleadings making the issues, and examine the record to determine the questions essential to the decision of the former controversy."

■ As the present suit is based upon the same claims of the Hagen patents declared valid in the Massachusetts case, we do not doubt that appellant, who conducted the defense in that case, is bound by the former decree as to validity [Reo Motor Car Co. v. Gear Grinding Mach. Co., 6 Cir., 42 F.2d 965, 967; Beyer Co. v. Fleischmann Co., 6 Cir., 15 F.2d 465; David Bradley Mfg. Co. v. Eagle Mfg. Co., 7 Cir., 57 F. 980, but whether it is bound by the former decree adjudging infringement is a matter to be determined by an examination of the record in both cases.

It is appellant's contention, as we understand it, that in the Massachusetts case, the court considered the "overlapping," referred to in claim 2 of No. 863, as the physical "overlapping" of the vanes one upon the other in the closed position; whereas, in this case, appellee is insisting that the claim should be construed to apply to "overlapping" of the vanes in other than the fully closed position, such as would define air passages of substantially uniform cross-section. Appellant contends that this is a shift in position by appellee from that taken by it in the Massachusetts case and that the whole question of validity and infringement of both patents in suit is again presented as a new question. We do not think that the question of validity is again presented but we give consideration to appellant's insistence.

We have italicized the concluding language of claim 2 of No. 863 above quoted.

It is true, as appellant contends, that there was language in the opinion of the Court of Appeals in the Massachusetts case tending to indicate its understanding that the word "overlapping" applied to the physical "overlapping" or overlying of a portion of the vanes in closed position.

The language that appellant relies upon is found at page 905 of Sturtevant v. Mass. Hair & Felt Co., 122 F.2d, supra, to wit— "When closed the vanes in each set overlap one another and so form the sides or walls of horizontal cylinders. * * *" Appellant accordingly points out that the court followed this sentence with its consideration of the barrel stave simile which it concluded by stating that in the patent the "barrel staves" overlapped in closed position.

But, contra, the court also indicated that this "feature" of overlapping at closure was not essential to the formation of air directing passages and the court quoted extensively from the Master's report, in which the importance of the vanes in defining air passages between them of substantially uniform cross-sectional areas, was stressed. Moreover, the court stated, "Hagen's contribution, then, was of a mechanism ·for controlling the output of a centrifugal fan by vanes, not down to a useless capacity of zero, but only to a minimum capacity." It followed this with the statement,

"It does not seem to us that it would have occurred to a mechanic * * * skilled in the art either to disregard increasing shock-loss by radically increasing the spin of the entering air or to construct vanes of cylindrical contour for the purpose of providing passage between them 'of substantially uniform cross-section as the vanes are moved to closed position', so that control to minimum capacity by spin rather than by throttling would result. Thus the finding of patentable invention made by the master and confirmed and adopted by the court must stand."

We think that these passages show clearly, that the court's conception of the invention lay in the overlapping of the vanes in space to provide passages of uniform cross-section, for obviously, if they did not overlap in space, passages could not occur, or be provided between them. That this was the court's view is further supported by its quotation with approval in its discussion of infringement of claim 2 of No. 863 (1) of the Master's statement, that "while the overlap of adjacent vanes in defendant's fan is less than in Hagen's patent, and substantially disappears at closing, in my judgment there is a sufficient overlap to fulfill the aim and purpose of an overlap in the functioning of the fan," and (2) of an expert's testimony, "that although the defendant's vanes continuously approached paral-·

lelism as the vanes were moved toward closed position and that although the defendant's vanes do not overlap as much as Hagen's, still as closure was approached they overlapped sufficiently to define air passages of substantially uniform cross-section."

■ Contrary to appellant's contention that this conception of overlapping in space was not present in the Massachusetts case, we find numerous references to it in the testimony in that case and we can reach no other conclusion, if at all material, than that it was the basis of the court's holding of validity. The same issue as to validity was presented there in the same terms as here, and we think that the validity of No. 863 is res adjudicata.

■ As to *infringement,* it does not appear that there was physical overlapping or overlying in the structures of Exhibits B and C, but there was such overlapping in space that the vanes of each structure defined air passages of substantially uniform cross-section between them as they moved toward closed position. In that position the vanes of Exhibit B appeared to touch but those of Exhibit C were so narrow that a small gap remained therebetween. However there was testimony before the court below sufficient to justify a conclusion by it that the strips of Exhibit B and the spaces between the vanes of Exhibit C had no material influence upon the action and no effect upon substantial tangential admission of the air other than the imposition of a slight limitation upon the range of control. And this court has said that one who appropriates the substance of a patented invention cannot avoid a claim of infringement by deliberately impairing function of one element without destroying the substantial identity of the structure, operation and result. King Ax Co. v. Hubbard, 6 Cir., 97 F. 795, 803. See also Virginia Art Goods Studios, Inc. v. Goldberg & Seltzer, 2 Cir., 76 F.2d 122; Merco Nordstrom Valve Co. v. W. M. Acker Organization, 6 Cir., 131 F.2d 277, 282; E. H. Bardes Range & Fdry. Co. v. American Engineering Co., 6 Cir., 109 F.2d 696, 698.

■ Since the apparatuses represented by Exhibits B and C functioned in a manner substantially identical with that represented by Exhibit 3 held to infringe in the Massachusetts case, and since the only perceptible effect of the structural modifications incorporated into Exhibits B and C was a slight impairment of the range of control permitted by the patented structures, it follows that Exhibits B and C cannot avoid the claim of infringement. The District Court's finding of infringement was not clearly erroneous and under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, we are not permitted to set it aside. Green v. Electric Vacuum Cleaner Co., Inc., 6 Cir., 132 F.2d 312, 314.

*PATENT No. 413.*

This patent is for an improvement upon No. 863. It adopts the disclosure of No. 863 of an apparatus for vane control on a forced draft fan, and, in so far as the patent is attacked on the ground that appellee has shifted its position from that taken in the Massachusetts case, what we have said with reference to No. 863 applies here.

Claim 1 calls for,

"A centrifugal fan comprising a rotor, a casing having an eye and a substantially conical inlet passage leading to the eye, and a plurality of vanes in the inlet pivoted on axes which are oblique to the rotor axis and substantially at right angles to the conical inlet, the vanes being adjustable about their axes from substantially wide open position in which they do not appreciably obstruct the flow of gas to the rotor through an angle of nearly 90 degrees to a closed position, throughout which adjustment they direct the entering gas to the rotor with an appreciable spin, the work done by the fan on the gas being variable in accordance with the adjustable spin introduced by the vanes at different positions."

Claim 2 added to claim 1 the hub on the rotor axis and the pivoting thereon. Claim 3 added means for simultaneous and uniform adjustment of the vanes; and claim 4 added the features of both claims 2 and 3 to claim 1.

■ In the Massachusetts case Exhibit 3 was held to infringe these claims and in view of our discussion of Exhibits B and C with reference to No. 863, we conclude that the holding of the District Court that they infringe all four claims of No. 413 should not be disturbed.

Decree affirmed.