**VULCAN, INC., Plaintiff-Appellee,**

v.

**FORDEES CORPORATION,
Defendant-Appellant.**

No. 78–3325.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 19, 1980.

Decided Aug. 14, 1981.

Rehearing Denied Oct. 14, 1981.

Thomas H. Murray, Rose, Schmidt, Dixon, Hasley & Whyte, Pittsburgh, Pa., for defendant-appellant.

Arland T. Stein, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Paul A. Weick, Weick, Gibson, Oldham & Aronson, Cuyahoga Falls, Ohio, for plaintiff-appellee.

Before BOYCE F. MARTIN, Jr., Circuit Judge, CELEBREZZE, Senior Circuit Judge, and JOINER,* District Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Fordees Corporation appeals from a judgment of patent validity and infringement. The issues before us concern the res judicata effect of a prior consent decree and the doctrine of equivalents. Specifically, Fordees argues: 1) that it was not in privity with the prior defendant and is therefore not bound by the determination of patent validity in the consent decree; and 2) that devices it built after entry of the decree do not infringe the patent.

---

* Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

The patent in dispute is the "Titzel" patent, granted to Titzel Engineering, Inc. on January 19, 1965.[1] The current owner of the patent is Vulcan, Inc., the plaintiff below. The patented and accused devices in this case are portable work towers, or "reline" towers, used in rebuilding the refractory lining of basic oxygen furnaces in which steel is made. These furnaces are lined with thick brick walls which retain the molten metal and insulate the vessel from the extreme heat that is generated. The heat eventually destroys the refractory lining, which must be replaced periodically. Since the relining process takes a vessel out of service temporarily, the lining must be replaced as quickly as possible.

Before the Titzel tower was introduced to the industry, it was necessary to build a wooden or metal scaffold from the ground up inside each vessel. This procedure took several days to complete and required two work crews, one to build the scaffold, the other to replace the refractory lining. It was also dangerous because bricks, lowered by a crane from the top of the vessel to the scaffold, could easily fall on the workers.

The Titzel tower substantially changed the relining process. It is a portable freestanding structure that collapses to fit through the narrow chimney of an oxygen furnace. Its working platform can be raised or lowered easily to different levels. A guided elevator cage transports bricks and other materials to the platform. Thus, the Titzel tower eliminates both the danger of falling brick and the inefficiency of building and disassembling scaffolds. It also enables use of the overhead crane for other jobs. Finally, it increases potential steel production by substantially reducing the time required to reline a vessel.

In 1970, Vulcan's predecessor, Titzel Engineering, brought an action in the Western District of Pennsylvania against M&G Industrial Associates and its president, Robert Munroe, for infringement of the Titzel patent. (W.D.Pa. Civ. Act. # 70–1333). Titzel claimed that M&G had infringed the patent by manufacturing and selling reline towers.

Early in 1971, Munroe contacted Fordees' president and told him about the Titzel patent. Fordees, M&G and Titzel were then bidding against each other for a contract to build a reline tower for the Gary Works of United States Steel Corporation. Although Fordees had never built a reline tower, it submitted a bid based on a plan or "cartoon." U.S. Steel accepted this bid and signed a purchase order with Fordees. As a condition of the contract, Fordees specifically agreed to hold U.S. Steel harmless from potential infringement of the Titzel patent.

After its bid was accepted, Fordees purchased from M&G a set of engineering drawings containing specifications for the construction of a reline tower. These drawings were M&G's principal asset; its practice was to subcontract construction work to firms which brought the drawings. Fordees purchased these drawings with knowledge that the reline tower they described was the subject of a patent infringement suit. Fordees also obtained technical assistance and engineering advice from M&G, after purchasing the drawings. Because of the pending litigation, Fordees insisted that M&G indemnify it against liability for infringing the Titzel patent.

Fordees then began to construct a reline tower for the Gary Works. Except for minor dimensional changes, it adhered to the specifications set out in the M&G drawings.

On October 14, 1971, Titzel's suit against M&G and Munroe ended with the entry of a consent decree and accompanying stipulation. The decree declared the Titzel patent both valid and infringed. Both M&G and Munroe agreed to stipulate that the reline tower described in the engineering drawings sold to Fordees infringed the patent. They also agreed to return the drawings to Vulcan, Inc. According to the decree, M&G had built four infringing reline towers and

---

1. U.S. Letters Patent No. 3,166,154.

had further infringed by supplying Fordees with the drawings and technical assistance.[2]

In the settlement, Vulcan agreed to release M&G and Munroe from liability for any acts of infringement completed before the date of the decree, intending by this clause to release Fordees from liability for the reline tower it was then building for the Gary Works. After the decree was entered, M&G and Munroe dissolved their reline tower business.

In 1973, Fordees began to construct additional reline towers. It bid for and obtained a contract to build a second tower for the Gary Works. As part of that contract, Fordees again agreed to hold U.S. Steel harmless against infringement of the Titzel patent.

On the basis of the foregoing facts, the District Court concluded that Fordees was in privity with M&G and was therefore bound by the 1971 consent judgment:

> Where, as here, during the pendency of a patent infringement suit, Fordees acquired from the defendant in the suit property rights to designs and engineering and technical assistance permitting Fordees to manufacture the device which is the subject of that suit; where such acquisition is made with full knowledge of the pendency of the suit; where the defendant in the suit agreed to indemnify Fordees for any damages resulting from Fordees' infringement of the patent in suit; where a consent judgment was negotiated in the action which benefitted Fordees; and where the consent judgment holds the patent valid and infringed; the Court finds Fordees is in privity with the defendant in the suit. See *A. W. Schnitger v. Canoga Electronics Corp.*, 462 F.2d 628 (9th Cir. 1972); *J. R. Clark Co. v. Jones & Laughlin Steel Corp.*, 288 F.2d 279 (7th Cir. 1961), *cert. denied* 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 32 (1961); *Alb, Inc. v. Noma Lites Inc.*, 231 F.2d 662 (2d Cir. 1956).

The court also found that the reline towers built by Fordees after the consent decree infringed the Titzel patent. We shall deal with those issues separately.

## I. Privity

We must first decide whether the District Court erred in finding that Fordees and M&G were privies with respect to the subject matter of the prior consent decree. If Fordees was in privity with M&G, then the 1971 judgment is res judicata and Fordees may not reexamine the validity of the Titzel patent.

█ Whether privity exists in a given case is a question of fact. *Harrison v. Bloomfield Bldg. Ind., Inc.*, 435 F.2d 1192 (6th Cir. 1970); *Astron Ind. Assoc. v. Chrysler Motors Co.*, 405 F.2d 958 (5th Cir. 1968); *Crane Boom Life Guard Co. v. Saf-T Boom Co.*, 362 F.2d 317 (8th Cir. 1966), *cert. denied*, 386 U.S. 908, 87 S.Ct. 853, 17 L.Ed.2d 782 (1966). The scope of our review is therefore limited, and we must uphold the District Court's findings unless they are clearly erroneous. Fed.R.Civ.Proc. 52(a).

Fordees contends that it was not a successor in interest to M&G, that it never acquired a property interest in the Titzel patent, and that it received no benefit from the consent decree. According to this argument, Fordees was merely "under license" to use the M&G drawings, having bought nothing "tangible" from M&G "except, perhaps, the paper on which the designs appeared."

█ This argument is unpersuasive. "Privity" is an ambiguous term, a shorthand designation for those persons who "have a *sufficiently close relationship* with the record parties to be bound by the judgment." Note, *Developments in the Law— Res Judicata*, 65 Harv.L.Rev. 818, 856 (1952) (emphasis added). Our review of the record discloses ample evidence that Fordees' relationship with M&G was in fact "sufficiently close" to establish privity.

---

**2.** The District Court stated, not quite accurately, that "the judgment found that five reline towers infringed the Titzel patent, four of which were made by M&G and one of which was made by Fordees in connection with M&G."

First, Fordees was more than a "mere purchaser" of a manufactured product. *See Gen. Chem Co. v. Standard Wholesale Phosphate & Acid Co.,* 101 F.2d 178 (4th Cir. 1939). *See also Brunswick v. Chrysler Co.,* 408 F.2d 335 (7th Cir. 1969); *J. R. Clark Co. v. Jones & Laughlin Steel Co.,* 288 F.2d 279 (7th Cir. 1961), *cert. denied,* 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 32 (1961). For our purposes, U.S. Steel, rather than Fordees, must be considered the ultimate purchaser of the reline towers.

Second, the record reveals that Fordees acquired the substance of the Titzel patent from M&G during the course of the litigation which ended in the consent decree. The fact that Fordees did not obtain "title" to the drawings is immaterial. The important point is that the drawings enabled Fordees to construct a reline tower to fulfill its contract with U.S. Steel. Indeed, without the plans, Fordees would not have been able to build any type of reline tower, much less a Titzel reline tower. By obtaining the technical knowledge embodied in M&G's engineering drawings, Fordees acquired a significant interest which facilitated its business. In *G&C Merriam Co. v. Saalfield,* 190 F. 927 (6th Cir. 1911), this court upheld a finding of privity on similar facts. Although the nature of the "substantial right" was never precisely established in that case, we held:

> What was the precise nature of the contract between [the parties] does not appear .... The court might well presume, if need be, that the contract was only of an agency and did not transfer a substantial right. But it is not material. The case was already pending, and the whole controversy had been submitted for the judgment of the court. Though not a party, Saalfield was bound by the final decree of the court. If a third party may thus come into the acquisition of rights involved in pending litigation without being bound by the final judgment, and require a suit de novo in order to bind him, he might, pending that suit, alienate that right to another with the same result, and a final decree bearing fruit could never be reached.

*Id.* at 938.

■ Third, it is well established that one interest sufficient to bring a non-party within the ambit of res judicata is a legal duty, right, or interest dependent wholly or in part on the outcome of a lawsuit. *Moore, Federal Practice* 1B ¶ 0.411(6). Here, Fordees' right to build reline towers according to M&G's plans was dependent on the result of the Pennsylvania litigation. Furthermore, Fordees insisted that M&G indemnify it against potential liability for patent infringement, thereby establishing another right which hinged on the outcome of the Titzel-M&G lawsuit. Finally, we point to the fact that Fordees agreed to hold U.S. Steel harmless against infringement liability for the Gary Works tower. Both Fordees' right to indemnity and its duty to indemnify depended in part on the pending litigation.

■ Professor Moore suggests that an indemnitor has sufficient interests at stake to be bound as a privy by a judgment. We think an indemnitee also has a sufficient interest, at least in a case such as this one in which the indemnitee itself agrees to indemnify a third party with respect to the subject matter of the litigation. *See Schlegel Man. Co. v. USM Co.,* 525 F.2d 775 (6th Cir. 1975), *cert. denied,* 425 U.S. 912, 96 S.Ct. 1509, 47 L.Ed.2d 763 (1976); *American Safety Flight Systems, Inc. v. The Garrett Co.,* 528 F.2d 288 (9th Cir. 1975); *In re Skyline Lumber Co.,* 311 F.Supp. 112 (W.D. Va.1970).

Fourth, Fordees continued to deal with M&G and Munroe after entry of the consent decree. It obtained a full set of reline tower engineering drawings from M&G, which it used to build additional reline towers. In addition, Fordees succeeded M&G as a major supplier of reline towers and reline tower technology when M&G dissolved at the conclusion of the lawsuit. These facts convince us that Fordees was a successor in interest to M&G. *J. R. Clark v. Jones & Laughlin Steel Co., supra.*

Fordees attempts to distinguish *Clark* by noting that the successor in that case acquired all the assets of the predecessor, whereas Fordees obtained only the right to use M&G's drawings. This distinction is without merit, for the record indicates that the only substantial assets M&G ever possessed were the very engineering drawings that Fordees acquired.

We also reject Fordees' argument that a successor in interest must formally take over its predecessor's business. In *Schnitger v. Canoga Elec. Co.*, 462 F.2d 628 (9th Cir. 1971) (*per curiam*), the court found privity between a prospective buyer of infringing products and their manufacturer, who had previously been enjoined from selling them. This derivative successive interest to the same property right was sufficient to establish privity. *See Amer. Equip. Man. Co. v. Wikomi Man. Co.*, 630 F.2d 544 at 545 n. 1 (7th Cir. 1980).

Federal courts are no longer bound by rigid definitions of the parties or their privies for purposes of applying res judicata or collateral estoppel. *Jackson v. Hayakawa*, 605 F.2d 1121 (9th Cir. 1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). *See also Montana v. United States*, 440 U.S. 147, 155–158, 99 S.Ct. 970, 974–76, 59 L.Ed.2d 210 (1979). The evidence in the record convinces us that Fordees' interests were "so closely aligned" with those of M&G that they were fairly represented in the Pennsylvania proceedings. *See Aerojet-General Co. v. Askew*, 511 F.2d 710 (5th Cir. 1975), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). *See also Jefferson School of Soc. Science v. Sub. Act. Control Bd.*, 331 F.2d 76 (D.C.Cir. 1973).

Finally, Fordees invites us to examine the economic circumstances that precipitated the consent decree. Fordees argues that it entered the consent decree under economic duress, therefore the decree should not have res judicata effect. While we recognize that fear of a treble damage award[3] might be a significant incentive to settle a case, we also recognize that negotiations for a consent decree invariably call for reciprocal compromises—each party relinquishes something it might have won had it proceeded with the litigation. Langsam, *Res Judicata Effects of Consent Judgments in Patent Infringement Litigation*, 36 Fed. Bar J. 171 (1977). We note that consent decrees are subject to a sufficient degree of judicial supervision to protect the parties from coercion and economic overreaching. *See Schlegel Man. Co. v. USM Co., supra.* Therefore, we refuse to engage in *ad hoc* examinations of valid consent decrees. *See American Equip. Co. v. Wikomi Man. Co., supra.*

We reiterate the view we expressed in *Schlegel*, that we wish to encourage settlement in patent litigation. *See also Wallace Clark & Co. v. Acheson Ind., Inc.*, 532 F.2d 846 (2d Cir. 1976), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976); *Aro Co. v. Allied Witan Co.*, 531 F.2d 1368 (6th Cir. 1975), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976); Langsam, *supra*. The strong public interest in achieving finality in litigation is advanced by giving res judicata effect to consent decrees. We decided in *Schlegel* that the interest in finality outweighs the interest in limiting patent monopolies, absent a strong overriding policy. *See also Wallace Clark & Co., Inc. v. Acheson Ind., Inc., supra*; Note, *Bar and Merger Treatment of Consent Decrees in Patent Infringement Litigation*, 74 Colum.L.Rev. 1332 (1974). We see no reason in this case to exalt the purely private, economic interest advanced by Fordees above either of the competing public interests present in *Schlegel*.

## II. Infringement

The second issue we face is whether the reline towers that Fordees built after the consent decree infringe the Titzel patent. The validity of a patent and its interpretation are both questions of law, which may depend upon factual inquiries. In-

---

**3.** 35 U.S.C. § 284 (1952).

fringement, on the other hand, is a question of fact. *Weidman Metal Masters v. Glass Master Co.*, 623 F.2d 1024 (5th Cir. 1980); *Schlegel Man. Co. v. USM Co., supra.* In *Weidman*, the Fifth Circuit summarized the principles of review we must apply to the infringement issue:

> A patent is obviously infringed if the accused device incorporates its teaching literally read. In reading a patent to determine whether it has thus been infringed, its claims must be read in connection with its specifications and its file history; the patent's claims cannot be construed to reach beyond the teachings expressed in the patent. Minor modifications are, therefore, sufficient to avoid literal infringement. Such alterations may, however, result in a device that appropriates the invention and incorporates its innovative concept into a device that performs substantially the same function in substantially the same way to obtain substantially the same result. The "doctrine of equivalents" protects the patent and its inventor from such abuse.

> The ultimate question, as the title of the rubric implies, is whether the accused device is functionally equivalent to the patented one. What constitutes equivalency is determined in the context of the scope of the prior art, the nature of the patent, the real invention disclosed by its specifications and examples and the extent of innovation accomplished. A pioneer patent disclosing a function never before accomplished is entitled to broader protection than one that makes minor improvements on known technology. The range of equivalents is also limited by the patentee's surrender or amendment of claims in response to demands of the patent examiner, a process that creates "file wrapper estoppel." 623 F.2d at 1026.

## A. The Doctrine of Equivalents

The District Court decided that Fordees' subsequent reline towers were substantially equivalent to the reline towers covered by the Titzel patent. The court scrupulously compared the Fordees towers with both the Titzel patent and the M&G towers challenged in the Pennsylvania litigation. It found that the Fordees towers appropriated neither the precise mode of support—"base means support"—taught by Claim I of the patent, nor the specific method of connecting the carrier means with the coupler means. Nevertheless, the court found these modifications too minor to avoid substantial equivalence. The Fordees towers appropriated Titzel's basic principle and mode of operation as "normally free-standing reline towers":

> "Free-standing" requires that the structure remain stable in position without the use of support means such as cables, overhead cranes and special frames brought in for the specific purpose of holding it in place. Each of the Fordees reline towers is stable in position on a primary foundation at the service floor with various means to stabilize and support the tower within the vessel. Admittedly, no cables, braces, overhead cranes or other ancillary devices are brought in for the specific purpose of maintaining the stability of the structure. The requirement that the tower be free standing does not require or imply that the structure is totally supported from its bottom or base.

Fordees' primary argument on the infringement issue is that "base means support" is the heart of the Titzel patent. Fordees claims that its own reline towers do not incorporate base means support and thus do not literally infringe Titzel. It presses further and argues that a tower without base support means cannot be equivalent to the Titzel reline tower.

The District Court decided that the essence of the Titzel patent is a free-standing tower and not merely base support means. Therefore, Fordees' single omission or modification of base support means was not a material change that would avoid infringe-. ment. We find no legal or factual basis on which to disagree. As the court below noted, "incorporation of each and every element, without exception, of every claim of a patented structure is not an absolute pre-

requisite to a finding of infringement by an accused structure," *citing Clarage Fan Co. v. B&F Sturtevant Co.*, 148 F.2d 786 (6th Cir. 1947).

As we interpret the Titzel patent, with reference to the language of the patent claims, its file wrapper history, and the prior art, we agree that base support means is not the heart of the invention. A careful reading of Claim I[4] of the patent itself reveals that the Titzel tower is not in fact solely supported by base means. Additional supports are called for to produce a free-standing structure. The following language calls for two means of support:

A portable work tower particularly adapted for use in vessels having an opening smaller than the interior comprising an elongated tower means adapted to pass through the opening in said vessel *and be normally free standing,* said tower means including upper and lower portions having spaced apart vertically extending members at the corners of a quadrangle, said vertically extending members on the lower portion being provided with carrier means vertically movable thereon, *base means on the lower portion adapted to engage the vessel bottom at spaced apart adjustable level points whereby the tower may be leveled and supported, a plurality of support arms spaced about said carrier means and pivoted thereon from a position parallel to the lower portion of the tower* to a position transverse to the tower means to form a working platform, spaced cage guides within the upper and lower portions forming an inner cage guide extending from adjacent one end of the tower to the opposite end of said tower, cage means vertically movable on said cage guides within the upper and lower tower portions and lift means on the tower means selectively raising and lowering the cage means, said cage means being selectively coupled with said carrier means for raising and lowering said carri-

er means with said cage means. (emphasis added).

By its terms, then, the patent does not solely teach base support means.

Furthermore, Dr. Romualdi, an engineering expert, testified at trial that a reline tower resting solely on feet at its base would be an unstable structure that would inevitably collapse under an eccentric load. He also confirmed that the Titzel patent taught several means of support, including a plurality of support arms. In addition to providing support for the tower itself, these support arms form the tower's working platform.

Vulcan's Exhibit 99, a specification for the Titzel patent, shows that the tower is actually supported by a trunnion ring across its waist, which allows rotation around a pivot point. According to Dr. Romualdi, "base support means" is a term of art broad enough to include any device below the waist or trunnion rings, and "top support" means anything above.

Our review of the prior art reinforces the conclusion that base support means is not the heart of Titzel. One of the significant advances Titzel achieved was the introduction of a "*free-standing*" tower. No relining device found in the prior art can be described as "free-standing." On the contrary, all require support from some point outside the vessel in which they are operating.[5]

▮ From the foregoing examination of the Titzel patent and the prior art, we conclude that the District Court's interpretation of Titzel is legally correct. The patent's grant is broad enough to encompass a free-standing reline tower, not one which relies solely on base support means. Titzel represents a substantial advance over the prior art through a number of improvements, taken in combination. It achieves what is known in the art as "synergy"—the device as a whole is greater than the sum of

---

4. Claim I is the only claim of four in the patent that has allegedly been infringed.

5. Relining devices in the prior art include: Myers, U.S. Letters Patent No. 1,380,074; Laabeck, No. 2,563,682; Arnold, No. 2,933,918; and Abarotin, No. 3,033,389.

its parts. For this reason, we reject Fordees' narrow reading.

█ We also find substantial evidence in the record to support the District Court's conclusion that the reline towers constructed by Fordees after the consent decree fall within the claims of the Titzel patent under the doctrine of equivalents. *See Graver Mfg. Co. v. Linde Air Products*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Olympic Fastening Systems, Inc. v. Textron, Inc.*, 504 F.2d 609 (6th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975). Dr. Romualdi testified repeatedly and without contradiction that there is no functional difference between the Fordees towers, and the M&G tower and the Titzel patent. Furthermore, the specifications for the Fordees towers in plaintiff's exhibits 99 through 106 show virtually identical structures.[6] This evidence supports the District Court's finding of equivalency. *See Arco Ind. v. Chemcast Co.*, 633 F.2d 435 at 440 (6th Cir. 1980).

## B. File Wrapper Estoppel

Finally, we must consider whether the prosecution history, or "file wrapper," of the Titzel patent will operate to remove Fordees' towers from the patent's ambit. *See Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The Supreme Court summarized the doctrine of "file wrapper estoppel" as follows:

> It is well settled that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to *narrow* his claim by the introduction of a *new element*, he cannot after the issue of the patent broaden his claim by *dropping* the element which he was compelled to include in order to secure his patent . . . The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto. (citation omitted) So where an applicant whose claim is rejected on reference to a prior patent, without objection or appeal, vol-

untarily restricts himself by an amendment of his claim to a specific structure, having thus narrowed his claim in order to obtain a patent, he "may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments which amount to a disclaimer."

*Arco Ind. v. Chemcast Co., supra*, slip op. at 439, *quoting I.T.S. Co. v. Essex Co.*, 272 U.S. 429, 443–44, 47 S.Ct. 136, 141, 71 L.Ed. 335 (1926) (citations omitted and emphasis added).

█ Fordees contends that Vulcan, having previously argued before the Patent Office that the tower is supported solely from the bottom, is now estopped from claiming that the heart of its invention is a free standing tower.

This would be a classic case for file wrapper estoppel if Titzel's original claim had described a free-standing tower and if the Patent Office had required the inventor to narrow his claim to recite support by base means alone. Were those the facts, Vulcan would indeed be estopped from seeking the benefit of the rejected claim and would be limited to prosecuting towers with base means of support. This court recently observed that the "classic application of file wrapper estoppel occurs where a broad claim is narrowed to secure a patent. The patentee is thereafter estopped from asserting that his patent has the scope originally claimed before the narrowing amendment." *Arco Ind. v. Chemcast Co., supra*, at 439.

However, the Titzel file shows that the patent ultimately granted is actually *broader* in scope than the description of the original claims. Thus, this case is the reverse of *Arco*. Titzel's original and first amended applications called for "base means support," remarking that the device was the first to derive its *major* support from the bottom and to eliminate all top support. The Patent Office rejected these applications, whereupon Titzel submitted a different set of claims.

6. See Appendix.

The inventor's remarks in support of the new claims, which were eventually accepted, did not limit discussion to base means support. Rather, they described the device as one "supported entirely by the vessel" and as a "tower structure . . . in which all of the support comes from the vessel within which the tower is operating." The patent as issued describes a "free-standing" structure. As we observed earlier, "free standing" does not imply support from the bottom. Rather, in the language of engineers, it implies stability and self-sufficiency.

Furthermore, Fordees has taken the remarks in Titzel's file history out of context. The language is not as limited as Fordees suggests. It in fact describes a free-standing tower in numerous references. For example: "(the tower is) supported entirely by the vessel in which the work is progressing." Distinguishing the Titzel invention from the Arnold and Abarotin patents, the remarks state, "Both require a separate supporting device;" and, in contrast to a third previous patent, "there is no suggestion in Laaback of a tower structure such as that called for in the claims *and* in which all of the support comes from the vessel within which the tower is operating."

■ Although the file history does contain certain remarks that stress base support means, we need not infer an intention that the remarks are exclusive. Those statements were made in an effort to describe the device and to distinguish the prior art generally, rather than to distinguish the prior art in terms of patentability. *See Kolene Co. v. Motor City Metal Treating, Inc.*, 440 F.2d 77 (6th Cir. 1971), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971); *Schramm, Inc. v. Hinde*, 385 F.Supp. 1037 (N.D.Ill.1974), *aff'd mem.*, 515 F.2d 511 (7th Cir. 1975), *aff'd mem.*, 539 F.2d 713 (7th Cir. 1976). Accordingly, we conclude that file wrapper estoppel will not save Fordees from infringement.

The judgment of the District Court is affirmed.

APPENDIX

Plaintiff's Exhibit 99

Jan. 19, 1965    J. M. TITZEL    3,166,154

PORTABLE SCAFFOLDS AND WORK TOWERS

FILED FEB 1 1962    3 SHEETS - SHEET 1

Fig.1.      Fig.2.

TRUNNION RING

INVENTOR
JOHN M TITZEL

Plaintiff's Exhibit 100

Jan. 19, 1965    J. M. TITZEL    3,166,154

PORTABLE SCAFFOLDS AND WORK TOWERS

FILED FEB 1 1962    2 SHEETS - SHEET 2

Fig. 3.

Fig. 4.

Fig. 5.

INVENTOR
JOHN M TITZEL

**1116**

Plaintiff's Exhibit 101
**M & G RELINE TOWER**
PURCHASED BY FORDEES

Plaintiff's Exhibit 102
**M & G RELINE TOWER**
PURCHASED BY FORDEES

Plaintiff's Exhibit 103
**FORDEES 1st RELINE TOWER**
U.S. STEEL GARY BOP SHOP No 2

TRUNNION

![black redaction bars]

Plaintiff's Exhibit 104 **FORDEES 1ˢᵗ RELINE TOWER**
U.S. STEEL GARY BOP SHOP Nº2

Plaintiff's Exhibit 105 **FORDEES 2ⁿᵈ RELINE TOWER**
U.S. STEEL GARY BOP SHOP Nº1

Plaintiff's Exhibit 106 **FORDEES 2ⁿᵈ RELINE TOWER**
U.S. STEEL GARY BOP SHOP Nº1

JOINER, District Judge, dissenting.

I dissent.

On the assumption that the prevailing law of res judicata and privity in this circuit prevents the defendant from challenging the validity of the patent at issue, I would nonetheless hold that the record does not support the finding of infringement and would reverse on this ground.

As a preliminary matter, I disagree with the majority opinion's crucial characterization of the teachings of the patent with regard to support means for the Titzel relining tower. Claim I of the patent teaches only one means of support, "base means on the lower portion adapted to engage the vessel bottom at spaced apart adjustable level points whereby the tower may be levelled. and supported . . ." The second means of support relied on by the majority does not exist. The portion of the patent claim relied on refers to the supports for the working platform: "[A] plurality of support arms spaced about said carrier means and pivoted thereon from a position parallel to the lower portion of the tower to a position transverse to the tower means *to form a working platform. . .*" This aspect of the tower does not provide support for the tower itself, but is the means by which the *work platform* is supported.

Secondly, the majority states that plaintiff's exhibit 99 reveals that the tower is actually supported by a trunnion ring across its waist, which allows rotation around a pivot point. The record reflects, however, that the trunnion ring supports not the tower, but the vessel within which the tower is used.

The patent in this case describes a tower that is "normally free standing." The term "free standing" must be given content by the claims of the patent itself as well as its file history. As noted above, Claim I of the patent refers to only one means of support—the base means identified by the numeral 16 on the diagram appended to this opinion. Claim 2 describes a *temporary* support feature to be used for setting the tower, the feature identified by numerals 36 through 39 on the diagram appended to this opinion. It is clear, however, that base means support is the key support feature of the patent, as is evident from the following history of the successive applications for the patent.

The initial application described a tower which had jack means at the bottom of the tower for supporting and positioning the tower. Additionally, the claims described outrigger members on the tower designed to bear on supporting members spaced from and about the tower. The outrigger members are now identified by numerals 36–39 in the current diagram of the patent. The patent office rejected the claim regarding base support means in view of the Laaback patent which taught a tower resting on one base support point. The application was then amended to stress that the base means were the primary support of the tower. However, references to the outriggers were retained. This application was also rejected, but not because of the claims relating to base support means. Rather, the outrigger feature was rejected in view of the Laaback patent which taught top support by way of a platform in conjunction with the base means identified above. Finally, the application was resubmitted, this time by a complete rewording of all the claims. The outrigger feature was relegated to providing temporary support for setting the tower. The only support means identified in Claim I was the base support means.

The remarks of the applicant's lawyer submitted in support of the second amended application give substance to the meaning of the term "free standing."

[The claims] have been rewritten to bring out the fact that the tower is normally freestanding and *supported solely from* the base of the tower . . .

The Laaback patent shows a vertical lift scaffold which is primarily supported

at the top by the members 28 and 32 [the platform] acting in conjunction with a leveling device 46 [at the base]. Again there is no suggestion in Laaback of a tower structure such as that called for in the claims and in which all of the support *comes from the vessel within which the tower is operating.* [Emphasis supplied.]

It was based on these remarks that the patent examiner approved the final claims and issued the patent.

At trial, plaintiff's expert, Dr. James P. Romualdi, testified that the Titzel tower had three support means. He first identified the base support means. He then identified the support contributed by the platform identified by the numeral 30 when it is connected to the service floor, 31. Finally, he identified the outrigger supports, but stated that these supports are not essential when the base means and platform operate together. He stated that if the tower were supported only by the base means it would not be stable and thus not free standing. However, when identifying the portions of the patent teaching support means, he pointed to no reference regarding the support derived from the platform when attached to the service floor. He could not have stated that the patent taught such support for it simply does not teach support by any means other than the base means and the temporary setting support derived from the outriggers. In fact the patent drawings show that the platform is not attached to the tower. Figure 1 of the diagrams appended to this opinion.

The record before this court indicates that the Titzel tower functions in a manner not described by the patent, and in a manner rejected by the patent office. However, the question before this court is not whether defendant's towers infringe plaintiff's towers as used, but whether they infringe plaintiff's patent. This they do not.

The district court found that the M&G and Fordees reline towers were primarily supported from the service floor. Both ap-

pellant and appellee agree that there is no difference between the first tower built by Fordees and subsequent towers built by it. The fact that the defendant's towers derived their primary support from the service floor distinguishes its towers from plaintiff's patent, and precludes a finding of infringement. The patent teaches sole base means support, and the method of support utilized by the defendant is substantially different from that claimed in the patent, and is simply not the equivalent. The use of a means to support the tower from the service floor cannot be considered an equivalent because this means of support is described in the prior art (Laaback patent).

For these reasons, I would conclude that the district court's finding of infringement is not supported by the record, and reverse.

PLAINTIFF'S EXHIBIT
NO. 1

Jan. 19, 1965        J. M TITZEL        3,166,154

PORTABLE SCAFFOLDS AND WORK TOWERS

Filed Feb 2, 1962        2 Sheets—Sheet 1

Fig.1.        Fig.2.

INVENTOR
John H Titzel

Jan. 19, 1965          J. M. TITZEL          3,166,154

PORTABLE SCAFFOLDS AND WORK TOWERS

Filed Feb. 2, 1962.          2 Sheets—Sheet 2

Fig.3.

Fig.4.

Fig.5.

INVENTOR
John M Titzel